

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-12-1998

# Selko v. Home Ins Co

Precedential or Non-Precedential:

Docket 96-1702

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Selko v. Home Ins Co" (1998). *1998 Decisions*. Paper 44.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/44

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 12, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1702

WILLIAM SELKO,
        Appellant

v.

HOME INSURANCE COMPANY,
        Appellee

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 95-cv-07653)

Argued May 5, 1997

BEFORE: STAPLETON, LEWIS and CAMPBELL*
Circuit Judges.

(Opinion Filed March 12, 1998)

Jeremy T. Ross (Argued)
Schiffman & Ross
1650 Market Street
50th Floor
Philadelphia, PA 19103-7301
Attorney for Appellant

_____

*Honorable Levin H. Campbell, Senior United States Circuit Judge for
the First Circuit, sitting by designation.

        James W. Christie (Argued)
        Christie, Pabarue, Mortensen &
         Young
        1880 JFK Boulevard
        10th Floor
        Philadelphia, PA 19103
        Attorney for Appellee

OPINION OF THE COURT

CAMPBELL, Senior Circuit Judge.

William Selko ("Selko"), who is the assignee of his former attorney's professional liability policy, appeals from the district court's grant of summary judgment denying recovery on this policy against Home Insurance Company ("Home").

I.

In 1982, at age 18, Selko was the passenger in a car that struck a telephone pole. The accident rendered him a quadriplegic. He and his father engaged Stephen R. Signore, Jr., a Pennsylvania attorney, who has since been disbarred, to represent him in obtaining compensation for his injuries. Signore prepared and Selko executed a power of attorney authorizing Signore to collect all sums due to Selko arising from the accident and to deposit them in banks and other depositories. Also included was an investment clause, giving Signore the authority

> [t]o invest in my name, in any stock, shares, bonds, securities or other property, real or personal, and to vary such investments as he may, in his absolute discretion deem best, and to vote at meetings of any corporation or company and to execute any proxies or other instruments in connection therewith.

Signore stated in a deposition that he prepared the power of attorney in light of his discussion with Selko's father, during which Signore stated "that there were going to be a lot of no-fault checks and people that had to be paid and

2

checks were going to have to be signed and whatever . . . .
[The father replied] you know, well, why don't you take care
of all that?"

Between 1982 and 1991, Signore collected various sums
on Selko's behalf from settlements and insurance claims.
From these recoveries, Signore invested $300,000 without
Selko's prior knowledge or further approval in real estate
ventures of his own. Signore placed the collected sums in
the bank account of a shell company wholly owned by him
called Innovative Concepts, Inc. ("ICI"). He then caused ICI
to issue "participation bonds" in Selko's name for the stated
amounts as evidence of "loans" by Selko to ICI. The bonds,
at least those of record, called for repayment of the original
sum, together with accrued interest at ten percent per
annum, after five years. (These bonds were due,
respectively, in 1994, 1995, and 1996.) The monies for
which the bonds were issued, consisting of Selko's
$300,000 as well as sums from other purported lenders,
were then used to purchase interests in Signore's sole
name in real estate ventures. Selko's ICI participation
bonds were "secured" by Signore's personal pledges of his
real estate interests and by Signore's personal guarantees.
ICI and Signore later defaulted on the bonds when they
became due, beginning in 1994, and in 1995 Signorefiled
for bankruptcy.

According to Selko, he did not learn that his personal
injury proceeds were being utilized in this manner until he
made inquiry of Signore in 1991. After Signore responded
with some information, Selko wrote Signore on May 9,
1991, expressing concern about the investments'
"illiquidity." Selko's letter also stated that he believed he
should "diversify and reduce my 100 percent exposure to
the vagaries of the local real estate market." Without
replying right away, Signore continued to invest in the
fashion described above. After further inquiries, Signore
again responded to Selko on October 30, 1991. Reassuring
him about the investments, Signore said that, for the "long
term," they were sustaining a very fair return. Further
correspondence between Selko and Signore led to Signore's
assurances to work with Selko and "get for you some
liquidity as soon as possible." (A building sale or

3

replacement of Selko by another investor were mentioned as possible ways to do this if the market improved.)

Selko later sought and received guidance from a retired attorney, Guy Gabrielson, who met with Signore in July of 1992. Gabrielson reported to Signore his understanding of that meeting in a letter dated July 17, 1992. In the letter, Gabrielson indicated the time was ripe to relieve Signore's office of further responsibilities. Gabrielson also said he believed Selko would like to divest himself as rapidly as possible of the real estate investments so that he could begin to diversify his investments under the guidance of an investment advisor, and that Gabrielson would advise Selko to do so. Signore testified in his deposition that he understood at about this time that he was being relieved of his representation of Selko.

Gabrielson's letter was quickly followed by a letter from Selko to Signore dated July 20, 1992, requesting that Selko receive "any part, or preferably all, of my interest payments currently" from the ICI participation bonds, and stating that he wished to divest himself of all bonds as rapidly as possible beginning with the last to mature. Signore was asked to make checks either for interest or principal payable to Selko's order and send them to him, so that he could begin the process of diversifying his portfolio into investments other than real estate.

On July 20, 1992, Selko also revoked Signore's 1982 power of attorney, substituting in its place a far more limited power of attorney. The new power contained no investment authority but merely authorized Signore to claim, demand and receive "any interest or principal payments which may be due or payable to me in investments heretofore made" under the old power of attorney and, after deduction of sums needed to prosecute the automobile accident claim, to remit the same to Selko. Any further funds received on Selko's behalf were to be deposited in a bank or other depository institution.

Signore neither acknowledged nor took any action to comply with the Selko's requests of July 20, 1992. He did not remit any interest nor did he take steps to liquidate Selko's investments as requested. No further

4

communication occurred between Signore and Selko until more than two years later, in September of 1994. In that month, the earlier of Selko's ICI participation bonds became due. A new attorney representing Selko made demands upon Signore for payment. When no payment was forthcoming, Selko commenced a legal action in the state court against Signore, seeking damages for legal malpractice and breach of fiduciary duty. This action was settled on July 31, 1995. The settlement agreement provided for entry of judgment against Signore for $443,585.50. As part of the agreement, Signore assigned to Selko all his rights against Home under a policy of professional liability insurance he had purchased for his law firm in April of 1994.

On October 12, 1994, a few days after Selko sued him, Signore promptly notified Home of Selko's malpractice action against him. Home refused to defend or indemnify Signore under the policy, asserting, among other defenses, that, when applying for the policy, Signore had known of but had not disclosed the existence of Selko's potential claim for breach of professional duty. Under the terms of the policy, Home agreed to pay damages on behalf of the insured for an act, error, or omission happening prior to the effective date of the policy only if before such date "the Insured had no basis to believe that the Insured had breached a professional duty . . . ."[1]  In declining liability, Home relied on this clause, and also on Signore's negative answer to a question in the policy application asking,

> "11.d. does any lawyer named in (question) 5(a) know
> of any circumstances, acts, errors or omissions that

_____

1. Signore's professional liability policy ran from April 20, 1994 through April 20, 1995. Its Coverage section provided that to be covered, an act, error, or omission had to occur

> "(aa) during the policy period or
> (bb) prior to the policy period provided that prior to the effective date
> of this policy

* * *

the insured had no basis to believe that the insured had breached a professional duty . . . ."

5

could [emphasis added] result in a professional liability claim against any attorney of the firm, or its predecessor.

Home continued to deny coverage under the policy when Selko, pursuant to the settlement with Signore and the assignment of the policy, later sought indemnification for the losses he had sustained because of Signore's wrongdoing.2 Selko then brought the present diversity action in the district court against Home. After discovery, both Selko and Home moved for summary judgment, and the court allowed Home's motion but denied Selko's. This appeal followed.

II.

In granting summary judgment to Home, the district court construed Signore's deposition testimony as admitting that, when applying for the policy, Signore already knew he had breached his professional duty to Selko. For this reason, the policy's basis to believe exclusion was held to bar recovery. The district court noted that Rule 1.8(a) of the Pennsylvania Rules of Professional Conduct provided, in essence, that a lawyer shall not enter into a business transaction with a client or acquire an ownership interest adverse to a client without full written disclosure of the transaction and terms. Additionally, the client is to be advised and given a reasonable opportunity to seek the advice of independent counsel.

The court determined that Signore's investment of Selko's funds in his personal real estate ventures clearly violated Rule 1.8(a). Signore did not advise Selko for two years where his money was invested and of Signore's personal financial involvement. Signore, moreover, did not honor his client's wishes, expressed in May 1991, to diversify, but instead increased the investment. The court found the investment authorization in the 1982 power of attorney fell short of being adequate written disclosure under Rule 1.8(a). The court concluded that when Signore applied for malpractice insurance in April of 1994, "he clearly had a

_____

2. Signore filed for bankruptcy in 1995 and was disbarred by consent.

6

basis to believe that a claim of malpractice could be brought against him."

In reaching this conclusion, the district court relied particularly upon a Wisconsin case, Logan v. Northwestern Nat'l Cas. Co., 424 N.W.2d 179 (Wis. 1988). As the district court explained, the Logan court "held that determining whether an insured had a `basis to believe' must be tested by whether the insured knew or believed that he had committed a breach of his professional duty.' " Selko v. Home Ins. Co., No. 95-7653, 1996 WL 397483, at *3 (E.D. Pa. July 10, 1996) (citing Logan, 424 N.W.2d at 186). The district court went on to say,

> "In adopting this standard, the Logan court rejected an objective standard, i.e. `knew or should have known,' because it potentially gives insurers a windfall to deny coverage in many cases and ultimately defeats the purpose of the contract."

Id. The district court determined, on the basis of Signore's deposition testimony, that there was no genuine issue of fact over whether Signore had a basis to believe he had breached his professional duty owed to Signore.

III.

On appeal, Selko accepts the Logan standard adopted by the district court, which tests whether an insurance applicant had a "basis to believe" he had breached a professional duty by whether he knew or believed he had done so. However, Selko argues that "[n]otwithstanding the district court's avowed acceptance of this standard, it wholly failed to apply it in practice."

According to Selko, Home failed to meet its affirmative burden of proving that Signore had a "basis to believe" that he had breached a professional duty. Viewing the evidence most favorably to himself, Selko contends that, at very least, a genuine issue of fact exists as to whether Signore knew or believed he had committed a breach of any professional duty when he applied for the policy.

Selko insists, moreover, that the court erred in finding that Signore made additional investments of Selko's money

after receiving Selko's letter dated May 9, 1991. Selko points to portions of Signore's deposition indicating that Selko's monies were invested in real estate as early as the mid-1980's and that later participation bonds were replacements of former ones that cannot be found. By the time Selko complained of "illiquidity" in 1991, it was supposedly beyond Signore's power to do more than continue the earlier investments.

Selko further complains that Signore never conceded in his deposition that he had actual knowledge of Pennsylvania's Professional Rule of Responsibility 1.8. According to Selko, Signore believed that the power of attorney, with its broad investment provision, empowered him to make the real estate investments in question. Selko concludes that the evidence is, at best, conflicting whether Signore ever subjectively knew he had violated any ethical duty to Selko.

By the same token, Selko denies that Signore knew of any potential malpractice claim against him. He argues that by granting him another, albeit more limited, power of attorney in 1992, Selko showed that he harbored no thoughts of a claim against him. Selko also cites to a case from the Eastern District of Missouri indicating that evidence "clearly reflect[ing] dissatisfaction" is a necessary prelude to invocation of the "basis to believe" exclusion. General Accident Ins. Co. v. Trefys, 657 F. Supp. 164, 167 (E.D. Mo. 1987). Selko further argues that, if Signore had any inkling of a pending claim, he would not -- as he did -- have switched malpractice carriers in April of 1994. In the years previous, Signore had continuously obtained malpractice insurance from another company, Selko says. Presumably, the "basis to believe" exclusion (or comparable proviso) would not have been a defense available to his earlier carrier, since the clause would only bar claims based on conduct prior to the issuance of a policy.

IV.

Perhaps the crucial issue in this appeal is the proper construction of the clause in the Home policy "that prior to the effective date of this policy . . . (2) the Insured had no

8

basis to believe that the Insured had breached a professional duty . . . ." We turn to that first. Because Pennsylvania law governs, we ask how the Pennsylvania courts would read that clause; but as there is no applicable Pennsylvania precedent we must construe the clause without direct guidance, looking at its language, the decisions from other courts to the extent helpful, and Pennsylvania's rules of construction.

As noted, Selko points to language in Logan, supra, suggesting the "basis to believe" provision should be read subjectively. So read, Selko contends, the record fails to support Home's burden of proving beyond genuine dispute that Signore actually knew or believed when he applied for professional responsibility coverage in April of 1994 that he had breached a professional duty.

Home disagrees that Signore's subjective belief is key. It argues that Logan does not dictate an exclusively subjective interpretation, and that, in any case, a correct understanding of the "basis to believe" clause is to be found in recent federal district court decisions from the Western and Eastern Districts of Pennsylvania. These decisions held, in essence, that the "basis to believe" clause requires a determination of whether the insured was subjectively aware of facts that would have led a reasonable attorney to believe that he had breached a professional duty. We agree with this "mixed" formulation and hold that, however Logan is understood, the district court cases have correctly tracked the meaning of the language.

The first of these decisions was Home Ins. Co. v. Stegenga, No. 90–275 (W.D. Pa. July 3, 1991), aff'd (3d Cir. Feb. 3, 1992). There an attorney neglected to bring a lawsuit before the statute of limitations had expired, having misled his client into thinking that he was diligently pursuing the matter. The district court said, inter alia,

> Stegenga argues that he did not know, subjectively, that his actions might give rise to liability. The insurance contract, he argues, disallows coverage only if he was actually aware of the legal consequences of his actions. Such an interpretation is manifestly inconsistent with the plain language of the policy.

9

True, the condition, set forth in the policy-- that the Insured "have no basis to believe" -- disallows coverage where the insured is subjectively aware of certain facts. There is no language, however, indicating that the insured must have been subjectively aware that these facts might give rise to liability. As long as the insured is subjectively aware of facts that, under an objective "reasonable person" standard would be seen as possibly giving rise to liability, he will not be covered for liability resulting from those incidents [citing Logan].

* * *

This, of course, makes perfect sense because otherwise, one would only need to [ ] make certain he was ignorant of his duties in order to be insured for violating them. No-one, not the insurer and not the insured, knows ahead of time what facts will give rise to liability. In order to properly allocate the risk, the policy sensibly puts the burden on the insured to disclose those facts known only to him, so that the costs of the risk can be evaluated with all the relevant information accessible to all parties.

Id. at 4-6 (emphasis in original). The analysis in Stegenga was endorsed in Home Ins. Co. v. Thorp, No. 95-951 (W.D. Pa. July 17, 1992), aff'd, 993 F.2d 877 (3d Cir. 1993), and in Home Ins. Co. v. Powell, No. 95-6305, 1996 WL 269496 (E.D. Pa. May 20, 1996). Most recently, Judge Cohill of the Western District of Pennsylvania wrote comprehensively to the same effect, specifically rejecting the district court's view in this case that a purely subjective measure applies. Mt. Airy Ins. Co. v. Thomas, 954 F. Supp. 1073, 1079 (W.D. Pa. 1997).

The above cases, decided in federal courts in Pennsylvania by judges familiar with that state's law, are of course neither binding on the Pennsylvania courts nor upon ourselves. We find their reading of the disputed policy language, however, to be persuasive and to comport with our understanding of its plain meaning. See Bateman v. Motorists Mut. Ins. Co., 527 Pa. 241 (1991) (language of contract is primary consideration in interpreting an

10

insurance contract); O'Brien Energy Sys. v. American Employers' Ins. Co., 427 Pa. Super. 456, 491 (1993), appeal denied, 537 Pa. 633 (1994) (policy language should be construed in accordance with plain and ordinary meaning).

Selko would construe the language "provided . . . the insured had no basis to believe that the insured had breached a professional duty" as if it were written, "provided . . . the insured neither knew nor believed that the insured had breached a professional duty." There is, however, a significant difference in meaning between these two formulations. The latter wording, had it been incorporated into the policy, would, indeed, have indicated that the insured's own knowledge and belief were the touchstones. But the actual policy language is different. Its phraseology -- that "the insured had [no basis to believe]" -- refers, it is true, to the factual predicate possessed by the insured. But it measures that predicate by the impersonal standard of a "basis to believe," not by what the insured knew or believed. Had the provision been meant to stand or fall on the individual insured's subjective assessment of the known facts, it could easily have used the words "knew" or "believed," as indicated above. Instead, by using the words "basis to believe," the policy pointed to an objective criterion.

Hence, we agree with Stegenga that the plain language of the exclusion calls for a two-stage analysis. First, it must be shown that the insured knew of certain facts. Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a "basis to believe," it must be determined that a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty.3

_____

3. We recognize that, in Pennsylvania as well as elsewhere, exclusions are strictly construed against the insurer, as are ambiguities in the policy. Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983); First Pa. Bank v. Nat'l Union Fire Ins. Co., 580 A.2d 799, 802 (Pa. Super. Ct. 1990). Clear policy language, however, is to be given effect, Standard Venetian Blind Co., 469 A.2d at 566; and courts should not "torture the language to create" ambiguities but should read policy provisions to avoid it, Niagara Fire Ins. Co. v. Pepicelli,

11

That the insured denies recognizing such a basis on grounds of ignorance of the law, oversight, psychological difficulties, or other personal reasons is immaterial.

This construction does not relieve the insurer of its burden to prove that the necessary underlying facts were actually known to the insured. But the insured may not successfully defend on the ground that he was uniquely unaware of ethical and fiduciary principles that all lawyers would know or that he did not understand the implications of conduct and events that any reasonable lawyer would have grasped.

Selko argues that to interpret the provision in this manner is unfair to a victimized client such as himself who has no other redress but his defalcating attorney's professional liability insurance. However, the exclusionary clause in question addresses only misconduct during the period prior to the effective date of the policy. It is reasonable for the insurer to refuse coverage for claims based on preexisting but undisclosed misconduct by an insured attorney. Nor is it unreasonable to tie such an exclusion to an even-handed "reasonable attorney" assessment, rather than to speculation concerning the individual attorney's subjective understanding. The latter approach, by rewarding the attorney who is ignorant of the law, or by encouraging disingenuous, after-the-fact justifications, could result in totally capricious and unpredictable outcomes. Under the mixed standard we believe the Pennsylvania court would adopt, coverage does not turn on psychoanalysis, yet the attorney is not made accountable for matters he did not know about, nor for known matters that would not cause a reasonable attorney to foresee a claim.

A case such as this is painful, in that it may leave a malpractice victim without an effective remedy. But courts

_____

Pepicelli, Watts and Youngs, P.C., 821 F.2d 216, 220 (3d Cir. 1987) (quoting St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981)). The mixed standard we adopt is not merely one of several possible interpretations but is, in our view, the interpretation plainly signaled by the contract language.

cannot conscientiously rewrite an insurance contract between a defalcating attorney and his insurer in order to furnish coverage for the wronged assignee. Where states have decided, on policy grounds, to guarantee insurance coverage, e.g. for motor vehicle injuries, they have done so by comprehensive legislation requiring specific kinds of insurance as a condition to licensure and by regulating policy language. No such legislation applies here.

V.

Applying the above interpretation of the Home policy, we hold that the only reasonable interpretation of this record is that a reasonable attorney in Signore's shoes would have realized in April 1994, when Signore applied for the insurance, that he had a basis to believe that he had breached a professional duty to Selko. Selko, we note, concedes in his appellate brief that Signore breached his common law fiduciary and professional duties under the 1982 power of attorney and the lawyer-client relationships by making unsuitable real estate investments and by failing to give Selko the necessary information to make any informed decision in the matter. The facts underlying the breach were all fully known to Signore when he applied to Home for professional responsibility insurance. The facts known to Signore would, additionally, have caused a reasonable attorney to answer "yes" rather than "no" to the question in the insurance application asking if the applicant knew "of any circumstances, acts, errors, or omissions that could result in a professional liability claim against any attorney of the firm." [Emphasis supplied.]

We disagree with appellant's suggestions that Signore's misconduct was merely marginal. To the contrary, it was egregious. Without meaningful explanation to and approval from his injured, youthful client, he loaned his client's monies to himself (ICI being wholly owned by him), using the funds to buy for himself partnership positions in various real estate ventures. These unauthorized loans were evidenced by five year bonds bearing ten percent interest that was not, however, payable until the bonds' maturity. As events were to prove, the bonds were risky in the extreme; they were unsecured by mortgages or meaningful

collateral. As Signore conceded, he did not disclose these transactions in writing to his client prior to receiving inquiry from Selko in 1991 nor does it appear that he made any adequate disclosure of any type. By this time, because of a falling market, Signore would not or could not disinvest although Selko asked him to do so. In his verified complaint against Signore, Selko properly described the investments, inter alia, as insecure and unsuitable for one in Selko's quadriplegic condition.

In utilizing Selko's funds in this way, Signore clearly subordinated his client's interests to his own greed. Had Signore's real estate ventures succeeded, Signore would have profited while Selko would, at best, have recovered his money after five years with accrued interest at ten percent per annum -- a rate little higher than conventional, safe investments would have paid on an annual basis. In a nutshell, without consultation and informed approval, Signore used his client's money to finance his own losing gamble in the real estate market.

Signore's contention that he was authorized to do this by the broad general investment clause in the power of attorney is obviously without merit. The chief purpose of the power, as Signore's own deposition attested, was to enable Signore to collect and administer Selko's multi-sourced recoveries. The investment clause cannot be read to authorize Signore to gamble with his client's money or utilize the money in ways that put his own interests ahead of Selko's. The district court, moreover, correctly took account of Signore's violation of Rule 1.8(a) of the Pennsylvania Rules of Professional conduct disallowing business transactions between lawyer and client without full written disclosure. See Rizzo v. Haines, 555 A.2d 58, 67 (Pa. 1989).

It is true that, in Signore's deposition testimony, he said he had discussed the real estate investments in the 1980's with Selko or Selko's father, and they appeared satisfied. Signore conceded, however, that these discussions were after the fact of the investments. Moreover, his recollection of what was said, and when, was so conclusory, blurred, and inconsistent as to render the testimony virtually meaningless. In his own deposition, Selko flatly denied that

14

Signore ever told him of the real estate investments prior to 1991, and even Signore admitted that he never provided written information until after the monies were locked into the "participation bonds" and so beyond withdrawal.

There is nothing, moreover, to the argument that Signore could not be expected to have known of Selko's dissatisfaction. When seeking insurance in April of 1994, Signore was well aware of facts that would have strongly indicated to a reasonable attorney that Selko was unhappy -- and would soon be even more unhappy. Selko had consulted another lawyer in 1992, had criticized the investments, had relieved Signore, had eliminated Signore's investment authority, and had specifically asked him to return his money. Almost two years had then elapsed without response and without return of any money. Signore stated in a subsequent letter that, during this period, the real estate market had "slowed to a crawl" and values were either "down or . . . stagnant." It was plainly apparent by April of 1994 that Selko's entire $300,000 was in imminent peril. Signore and ICI in fact defaulted on the bonds only four months later. In these circumstances, a reasonable attorney in Signore's shoes would have realized that he had a dissatisfied client who would undoubtedly take further legal action absent a miraculous and unlikely turnaround in the real estate market.

Since this case arises on summary judgment, the ultimate question boils down to whether, viewing the record most favorably to plaintiff, a reasonable fact finder might find that, seen through the lens of what a reasonable lawyer would have believed, Signore was without basis to believe that he had breached a professional duty.

To state this question is to answer it. We do not see how it could reasonably be found on this record, even when viewed most favorably to plaintiff, that a reasonable lawyer would have had no "basis to believe" that a breach of professional duty had occurred.

There is no need to proceed further. We affirm the judgment below. See Central Penn. Teamsters Fund v. Peat Marwick Main S. Co., 85 F.3d 1098, 1107 (3d Cir. 1996)

15

(court of appeals may affirm on any ground supported by record).

So ordered.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

16