OPINION OF THE COURT
Saxe, J.
The law firm Pepper Hamilton and one of its members, W. Roderick Gagné, were deprived of millions of dollars in professional liability insurance coverage purchased by the firm, by the order of the motion court declaring that the three excess insurance carriers have no obligation to indemnify the firm. The court reasoned that because the law firm knew of misconduct on the part of its client, and of the likelihood that claims would be made against the firm itself based upon its representation of that client while the misconduct took place, it had an obligation to inform the insurers of its knowledge of the misconduct and its concern that it might be subject to suit as a result when applying for coverage or for renewal of coverage. As to two of the insurers, the court precluded coverage under the policies’ “prior knowledge” exclusions, and as to the third, it held that the insurer was entitled to rescission of the policy effective the year the claims were made.
The underlying claims against counsel arise out of an alleged securities fraud scheme by the firm’s former client, Student Finance Corporation (SFC), and its principal, Andrew Yao. SFC was in the business of financing loans to students in trade schools, primarily truck driving schools; it then pooled the loans into certificates or securities that it sold to investors, using private placement memoranda prepared by Pepper Hamilton. Another client of Pepper Hamilton, Royal *199 Indemnity Company, provided credit risk insurance for the pooled loans.
It is asserted that in order to make its operations appear more successful, SFC falsely represented to investors that student loans in its securitized loan pool were not more than 90 days overdue and in default, when in fact, significant numbers of them were in default. In order to make it appear that student loans in the securitized loan pool were current, rather than more than 90 days overdue, SFC made forbearance payments from reserve accounts of its own. This practice resulted in SFC’s understating its default rates, skewing its performance data for the student loans and making the certificates more attractive to investors, underwriters and credit risk insurers.
SFC’s inaccurate representation of its default rates apparently began to come to light in or around March 2002, when a round of financing fell through after the lender uncovered SFC’s use of forbearance payments through careful scrutiny of its financial documents. Without the new financing, SFC no longer had the liquidity to make up the monthly shortfalls in loan payments. According to Gagné, Yao first directly informed him in mid-March of SFC’s practice of making forbearance payments for loans that would otherwise be declared in default. While Pepper Hamilton initially continued to represent SFC, after further consideration and interoffice consultation, it withdrew from its representation of SFC on April 24, 2002.
SFC was eventually forced into bankruptcy, and in April 2004, the bankruptcy trustee contacted Pepper Hamilton to request that it enter into a tolling agreement while he considered whether to bring any claims against the law firm. At this point, Pepper Hamilton notified its primary professional liability insurer, Westport Insurance Corporation, of the potential claim; the excess insurers—Executive Risk Indemnity Inc. (ERII), Continental Casualty Company and Twin City Fire Insurance Company—were notified as well.
In November 2004, the bankruptcy trustee commenced an action against the firm and Gagné; another action was commenced by Royal Indemnity in March 2005. These underlying professional liability claims against Pepper Hamilton and Gagné allege negligence in their failure to discover SFC’s securities fraud, as well as actual complicity in SFC’s fraudulent scheme.
*200 Pepper Hamilton’s professional liability coverage for the period from 2001 to 2004 was as follows:
April 27, 2001 to October 27, 2002 Year 1)
Primary Westport $20 million
1st Excess Continental $30 million
October 27, 2002 to October 27, 2003 Year 2)
Primary Westport $10 million
1st Excess Twin City $10 million
2nd Excess Executive Risk $10 million
3rd Excess Continental $10 million
October 27, 2003 to October 27, 2004 Year 3)
Primary Westport $10 million
1st Excess Twin City $10 million
2nd Excess Executive Risk $10 million
3rd Excess Continental $10 million
While Westport did not contest its obligation to defend Pepper Hamilton, the excess insurers interposed various challenges to coverage, and all the insurers disputed the proper period in which the claims should be deemed to fall. On October 12, 2005, ERII commenced this action against Pepper Hamilton, Gagné and Westport, seeking a declaration that it had no obligation to indemnify the firm or its partner in connection with the actions brought by the bankruptcy trustee and Royal. Pepper Hamilton and Gagné counterclaimed for a declaration in their favor and brought third-party claims against the other two excess carriers. Continental cross-claimed for rescission of its excess policies for 2002-2003 and 2003-2004, based upon the alleged nondisclosure of information known to the law firm prior to their issuance.
The excess insurers all moved for summary judgment, contending that they had no coverage obligation, due to the application of the prior knowledge exclusion in their policies, or because the claim should be deemed to fall within a period in which they had no coverage obligation, or on the ground that rescission of their policy covering the period of the claim was required based upon a misrepresentation of facts in Pepper Hamilton’s application for insurance. The motion court granted the excess insurers’ motions. It declared that the prior knowledge exclusion applied as a matter of law, reasoning that the *201 documentary submissions—numerous e-mails and memoranda acknowledging the possibility of a lawsuit against them—establish as a matter of law that in 2002 Gagné and Pepper Hamilton were aware of facts that could lead a reasonable attorney to anticipate litigation arising from its representation of SFC. The motion court also granted Continental’s cross motion, concluding that Continental was entitled to rescind its 2002-2003 and 2003-2004 policies based upon Pepper Hamilton’s failure to disclose the SFC circumstances in its renewal applications and that the claim could not fall within Continental’s 2001-2002 policy, since the insurer was not notified of the claim until 2004, and the rescission of the later policies meant that the continuous coverage provision did not apply.
This appeal ensued. For the reasons that follow, we reverse.
The insurance coverage is dictated by the terms of the West-port primary policies, since the ERII, Twin City and Continental excess policies expressly incorporate the majority of the terms of the Westport primary policies. The Westport primary policies contain the following insuring agreement clauses:
“LA. The Company shall pay on behalf of any INSURED all LOSS in excess of the deductible which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter, by reason of any WRONGFUL ACT occurring on or after the RETROACTIVE DATE, if any.
“LB. If, during the current POLICY PERIOD, any INSURED first becomes aware of a POTENTIAL CLAIM and gives written notice of such POTENTIAL CLAIM to the Company either during the current POLICY PERIOD, or during the POLICY PERIOD of any subsequent policy issued to the NAMED INSURED as a result of continuous and uninterrupted coverage with the Company, any CLAIMS subsequently made against any INSURED arising from the POTENTIAL CLAIM shall be considered to have been first made during the POLICY PERIOD the INSURED first became aware of a POTENTIAL CLAIM.”
The policies define the term “claim” as a demand made upon the insured for a loss, including by a suit or an arbitration *202 proceeding or administrative proceeding against the insured, while a potential claim is defined as either “any act, error, omission, circumstance or PERSONAL INJURY which might reasonably be expected to give rise to a CLAIM against any INSURED under the POLICY” or “any breach of duty to a client or third party which has not resulted in a CLAIM against an INSURED.”
The “prior knowledge” exclusion upon which ERII and Twin City rely provides that the policies do not apply to any claim “arising out of any act, error, or omission committed prior to the inception date of the policy which the insured knew or should have known could result in a claim, but failed to disclose to the Company at inception.”
We disagree with the motion court’s broad view of the nature and extent of the acts, errors or omissions and the type of knowledge to which the prior knowledge exclusion may be applied.
The two-step analysis set out in Coregis Ins. Co. v Baratta & Fenerty, Ltd. (264 F3d 302, 306 [3d Cir 2001]) should be used to determine whether the exclusion applies. In Coregis, the Third Circuit employed what it referred to as a “mixed subjective/ objective standard” to determine whether a professional liability policy’s similarly-worded exclusion applied. That standard asks first the subjective question of whether the insured had knowledge of the relevant facts, and second, the objective question of whether a reasonable lawyer would foresee that those facts might be the basis of a claim.
The primary focus of our analysis here is the objective requirement that there be a basis on which to reasonably expect a claim against the law firm. Notably, it has been held that this prong of the test “does not require that the insured actually form such an expectation [that a suit or claim will result]” (Colliers Lanard & Axilbund v Lloyds of London, 458 F3d 231, 237 [3d Cir 2006]), but that a reasonable person would expect the claim. By the same token, even if the evidence establishes as a matter of law that the insured has formed a subjective belief that a suit may ensue based upon some other party’s misconduct, that does not alone establish the existence of objective facts which would support the conclusion of a reasonable professional that the insured will be subjected to professional liability claims.
Here, while evidence strongly suggests that defendant Gagné and other firm members subjectively either believed or feared *203 that the firm might be subjected to professional liability claims by entities claiming injury as a result of SFC’s conduct, his or the firm’s subjective belief that a suit may ensue based upon SFC’s misconduct is not enough. Pepper Hamilton’s knowledge of SFC’s actions, and of its own legal work related to SFC’s operations, may have provided objective evidence that SFC might be sued and supported a concomitant suspicion that those with claims against SFC might seek relief against SFC’s law firm as well. But we find nothing in the record constituting objective evidence permitting a reasonable professional to conclude that Pepper Hamilton itself did anything that would subject it to suit or other claim. Certainly, no wrongful conduct on Pepper Hamilton’s part is established as a matter of law so as to entitle the insurers to summary judgment declaring that the firm knew or should have known that a claim might be made against the firm.
We recognize that the policy here, unlike that in Selko v Home Ins. Co. (139 F3d 146, 149 [3d Cir 1998]), does not specify that the prior knowledge exclusion applies where there is “basis to believe that the Insured had breached a professional duty.” Therefore, Seiko’s holding is not directly applicable insofar as, in accordance with that insurance policy, it requires the insurer to present facts establishing that the insured breached a professional duty. We further recognize that Coregis Ins. Co. v Baratta & Fenerty (supra) may not be relied upon to require the insurers to establish a breach of a professional duty. Although the court in that matter stated that such a breach and a basis for a claim are “two peas in a pod” and that a breach of a professional duty will tend to establish a basis for a claim (264 F3d at 307 n 3), as a matter of logic, the converse of that statement is not necessarily true. Under the terms of the policies at issue here, the insurers are not required to establish that facts known to Pepper Hamilton establish that the firm breached a professional duty.
Nevertheless, even though the terms of the policy exclusion here do not require that the insured had prior knowledge that it breached its professional duty, we cannot read the exclusion as the insurers suggest, that is, to apply whenever the insured has knowledge of a client’s misconduct and represented the client while the misconduct occurred. Construing the prior knowledge exclusions strictly and narrowly, as we must (see Belt Painting Corp. v TIG Ins. Co., 100 NY2d 377, 383 [2003]), we conclude that the “known of’ act, error or omission at the heart of such *204 a potential claim must be that of the insured, not that of its client. Furthermore, such act, error or omission must constitute wrongful conduct on the part of the insured; the firm’s mere representation of a client while the client itself—unknown to the firm—engages in wrongful conduct cannot suffice.
ER.II and Twin City contend that the requisite “act, error, or omission” that the law firm knew or should have known about before the policies’ inception and of which it should have notified its insurers is established by numerous pieces of evidence, including the private placement memoranda the law firm prepared for SFC’s use in selling the certificates, which memoranda inaccurately stated that the pooled student loans were not in default; Gagné’s e-mails informing the law firm of SFC’s conduct; his memorandum to the firm’s finance and ethics committee seeking its input and advice; a memorandum from the firm’s general counsel advising all the firm’s attorneys who had been involved in providing services to SFC to save all records and to refrain from discussing the matter with anyone outside the firm, in order to protect the firm’s interests; and other documents containing similar content. Other submissions, primarily e-mails from Gagné referring to SFC’s use of school reserves, were offered to establish that before April 2001 Pepper Hamilton was aware of SFC’s forbearance payments from reserve accounts to cover loan defaults.
The insurers’ focus on evidence establishing Pepper Hamilton’s and Gagné’s knowledge of SFC’s misconduct misperceives the nature of the “act, error, or omission” requirement for the application of the prior knowledge exclusion. The difficulty with their position is that these pieces of evidence tend to establish wrongful acts by SFC, not wrongful acts by Pepper Hamilton or Gagné. Even Pepper Hamilton’s preparation of the private placement memoranda, in which it included information that apparently was inaccurate regarding the existence of loan defaults, does not establish—at least not as a matter of law on a summary judgment motion—the commission of wrongful or improper acts by Pepper Hamilton.
We reject the suggestion that the prior knowledge exclusion applies when the knowledge possessed by the insured is that it drafted documents that the client then used to further its scheme. In our view, the policy cannot be properly read to require Pepper Hamilton to notify its potential insurers of its client’s misconduct and its own recognition that it may be subjected to legal claims brought by those injured as a result of *205 its client’s misconduct. It is not enough that the firm has adverse information about a client; the firm must have itself acted improperly, so as to have itself created the possibility of a professional liability claim against it.
Although the prior knowledge exclusion pertains to “any act” of the insured and is not specifically limited to wrongful acts that will result in claims of malpractice or breach of professional duty, the provision’s use of the words “any act” cannot reasonably be understood to apply to the mere act of providing professional services. Any other interpretation would require a law firm with such coverage to notify its carrier any time the firm performed ordinary and usual professional services in the course of representing a client, including the preparation of standard documents, if it discovered that the client might then have used those properly prepared documents in the course of possibly perpetrating a fraud or other illegal act against others. It is simply unreasonable that in order to protect its liability coverage, a law firm must inform its professional liability carrier as soon as it finds out about its client’s possible misconduct any time the firm believes that it could be subject as a deep pocket to claims by the client’s creditors.
We recognize that the plaintiffs in the underlying actions against the law firm have alleged misconduct on the part of Pepper Hamilton and Gagné and, further, that Gagné is said to have possessed enough knowledge of SFC’s use of reserve accounts to render the firm complicit with SFC’s scheme. If it is ultimately established that the law firm participated in the misconduct, such as by preparing documents on behalf of the client knowing that the documents contained false or insufficient information, or by knowingly creating the forbearance payment mechanism in order to assist SFC in defrauding investors, then application of the prior knowledge exclusion could be justified. But, in this context and on this evidence, those are not conclusively established facts but merely disputed factual assertions which fail to establish, as a matter of law, the firm’s knowledge of an act of misconduct of which it should have informed its professional liability insurance carriers.
We further reject ERII and Twin City’s alternative argument that as a matter of law they have no insurance obligation because the underlying claims triggered policy coverage in Year 1 (April 27, 2001 to October 27, 2002). The record before us does not support such a determination. We therefore conclude that summary judgment in favor of ERII and Twin City was improper.
*206 A similar analysis requires the reversal of the grant of summary judgment to Continental.
The motion court granted rescission of the 2002-2003 and 2003-2004 excess policies Continental issued to Pepper Hamilton, based on Pepper Hamilton’s failure to disclose, in its renewal applications, its knowledge of SFC’s misconduct and the claims it believed might result. However, an insurance policy may only be rescinded due to a misrepresentation in the application when the subject matter of the misrepresentation is material to the risk and the applicant knew of the falsity and made the misrepresentation in bad faith (see Allstate Ins. Co. v Stinger, 400 Pa 533, 539, 163 A2d 74, 78 [I960]). Moreover, the party seeking rescission has the burden of establishing these elements by clear and convincing evidence (Justofin v Metropolitan Life Ins. Co., 372 F3d 517, 521 [3d Cir 2004]).
The evidence relied upon here, as discussed, simply shows that Pepper Hamilton knew of SFC’s misconduct and believed (correctly) that it might itself be subjected to lawsuits brought by parties injured by SFC’s actions. The questions of whether Pepper Hamilton gave false answers on Continental’s renewal application and whether any such false answers were given in bad faith are questions of fact and cannot properly be determined as a matter of law in the context of a summary judgment motion. Even if we were to accept that the information omitted constituted information that was required by the policy renewal application, Continental fails to establish as a matter of law that if it had been informed of the client’s misconduct and the firm’s concern about being subject to suit as a result, it would have handled the renewal application differently. The affidavit of an underwriter asserting that, had the information been disclosed, the renewal application would have been handled differently, is not by itself sufficient to satisfy the insurer’s burden (see Feldman v Friedman, 241 AD2d 433 [1997]; Chicago Ins. Co. v Kreitzer & Vogelman, 210 F Supp 2d 407, 412-413 [2002]).
Unless and until it is established that the later policies are rescinded, the continuous coverage provision of Westport’s policy applies to provide for coverage based upon the 2004 notice. The grant of summary judgment to Continental was therefore improper.
Accordingly, the order of the Supreme Court, New York County (Karla Moskowitz, J.), entered on or about January 4, 2008, which, inter alia, granted the motion and cross motion of plaintiff Executive Risk Indemnity Inc. and third-party *207 defendants Continental Casualty Company and Twin City Fire Insurance Company, and declared that they are not obligated to defend and indemnify defendants Pepper Hamilton LLP and W Roderick Gagné under the subject excess professional liability insurance policies, should be reversed, on the law, without costs, and the motion and cross motion for summary judgment denied.
Motion seeking leave to take judicial notice and for other related relief granted.
Catterson, McGuire and Acosta, JJ., concur.
Order, Supreme Court, New York County, entered on or about January 4, 2008, reversed, on the law, without costs, and the motion and cross motion for summary judgment denied. Motion seeking leave to take judicial notice and for other related relief granted.
[Next page is 251.]
*0 1