

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-11-2006

# Colliers Lanard v. Lloyds of London

Precedential or Non-Precedential: Precedential

Docket No. 05-3497

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Colliers Lanard v. Lloyds of London" (2006). *2006 Decisions.* Paper 529.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/529

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 05-3497

COLLIERS LANARD & AXILBUND

v.

LLOYDS OF LONDON; HALLMARK INSURANCE CO.,
INC.

*CERTAIN UNDERWRITERS OF LLOYDS OF
LONDON,

Appellant

*(Pursuant to Rule 12(a), F.R.A.P.)

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No.: 02-CV-06127
District Judge: The Honorable Joseph R. Rodriguez

_____

Argued July 10, 2006

Before: SMITH, ALDISERT, and ROTH, *Circuit Judges*

_____

Counsel:      Vincent F. Reilly
Patricia M. Henrich (Argued)
Reilly, Janiczek & McDevitt
2500 McClellan Boulevard
Suite 240, Kevon Office Center
Merchantville, NJ 08109
        *Counsel for Appellant*

Alan C. Milstein
Jeffrey P. Resnick (Argued)
Sherman, Silverstein, Kohl, Rose &
    Podolsky
4300 Haddonfield Road
Suite 311
Pennsauken, NJ 08109
        *Counsel for Appellee*

_____

## OPINION OF THE COURT

_____

SMITH, *Circuit Judge*.

Appellant Lloyds of London ("Lloyds") provided a

2

"claims made" professional liability insurance policy[1] to appellee Colliers, Lanard & Axilbund ("CL&A"), a real estate brokerage. The policy provided retroactive coverage for claims "provided that the insured had no knowledge of any suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance." CL&A brought a breach of contract action in the District Court after Lloyds denied coverage for a claim arising from a mistake that CL&A had committed prior to obtaining the policy. Following a bench trial, the District Court concluded that the policy did not exclude the disputed claim and entered judgment in favor of CL&A.

On appeal, the key issue in this diversity case governed by New Jersey law is the proper construction of the policy exclusion. We hold that the plain language of the policy exclusion mandates a subjective test for the first part of the necessary inquiry–whether the insured had knowledge of a suit, act, error, or omission–and an objective test for the second part of the necessary inquiry–whether the suit, act, error, or omission might reasonably be expected to result in a claim or suit. We further predict that the New Jersey Supreme Court would hold that this clear and unambiguous policy exclusion should be

---

[1] A "claims made" policy provides retroactive coverage for liability arising out of acts which occurred before the policy effective date provided that the claim is brought during the policy period.

applied according to its plain language.

Consequently, we conclude that the District Court erred as matter of law by applying an objective test to the first part of its inquiry and a subjective test to the second part of its inquiry. Because the District Court's conclusion that the policy did not exclude the disputed claim depended on its application of this erroneous test, we will vacate the District Court's judgment and remand for further proceedings.[2]

I.

West Jersey Medical and Professional Plaza ("West Jersey") hired CL&A to be their real estate leasing broker for the West Jersey Medical and Professional Plaza in Voorhees, New Jersey. CL&A marketed the Plaza and also drafted the lease agreements between West Jersey and any tenants that CL&A obtained. CL&A in turn received commissions for each tenant that it obtained.

West Jersey dealt solely with Jason Wolf, a salesman for CL&A who has a bachelor's degree in Business Administration with a concentration in Real Estate and Business Law and additional training in commercial real estate leases. Wolf

---

[2]The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction over the final judgment of the District Court pursuant to 28 U.S.C. § 1291.

obtained as tenants Schaffer Medical Associates ("Dr. Schaffer") and Albert R. Franciscan, M.D. ("Dr. Franciscan"). Wolf prepared leases for these tenants, but essential terms were entered incorrectly–an operating expense term that should have read $8.84 per square foot was entered at $0.00. Wolf reviewed the leases but did not notice the errors. CL&A's General Counsel, George Gordon, also reviewed the leases but did not notice the errors. Finally, Steven Shapiro, the managing member of West Jersey, also did not notice the errors when he reviewed and signed the leases.

At some point prior to July of 2000, Shapiro became aware of these errors. He discussed the situation with Wolf, who acknowledged the errors. On July 14, 2000, Wolf drafted letters to the two tenants, informing them that a "mutual mistake" had been made in their leases and proposing remedies. In letters dated July 24, 2000, and August 25, 2000, respectively, Dr. Schaffer and Dr. Franciscan denied that there was a mutual mistake in their leases and rejected Wolf's proposed remedies. Dr. Schaffer's letter also stated: "Any further discussions regarding this matter should be directed to our attorney." At trial, the parties stipulated that "Mr. Gordon, who's the in-house counsel, knew about those letters, and he knew about the response to those letters, and in essence he knew everything that Mr. Wolf knew."

On August 29, 2000, Gordon signed a "Real Estate Errors and Omissions Liability Application" for a "claims made" policy to be issued by Lloyds, effective for one year as of

5

November 4, 2000, with a retroactive date of November 4, 1992. CL&A received the policy from Lloyds on December 18, 2000. The policy stated that it would provide coverage for claims "prior to the effective date of this insurance and subsequent to the retroactive date . . . provided that the insured had no knowledge of any suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance."

On January 10, 2001, West Jersey's counsel sent a letter to CL&A stating that West Jersey was going to seek legal relief against all parties related to the leases, including CL&A. On January 24, 2001, CL&A was served with a complaint from West Jersey, and Gordon informed CL&A's insurance broker about the lawsuit. On February 14, 2001, Lloyds denied CL&A's claim for defense and indemnification in this litigation, claiming that CL&A was "aware of issues or circumstances which 'might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance.'"

CL&A answered West Jersey's complaint and also filed a counterclaim for lost commissions.[3] CL&A and West Jersey eventually settled. The loss to West Jersey resulting from the

---

[3]CL&A's counterclaim against West Jersey was based on the theory that as the signatory of the lease, West Jersey was responsible for the mistake, and therefore was also responsible to CL&A for lost commissions.

mistake was estimated at $214,528.00, and CL&A assumed $135,290.80 of this liability.[4] CL&A also incurred $112,062.09 in attorneys' fees.

On December 30, 2002, CL&A filed a complaint against Lloyds in the District Court, seeking to recover the costs that it had incurred in defending and settling the West Jersey litigation. On April 18, 2005, the District Court conducted a bench trial. During the bench trial, Gordon testified that "[m]ost landlords and tenants most always settle their disputes." He also testified that he believed that letters of Dr. Schaffer's kind were "typically an invitation to negotiate." Gordon acknowledged that if the tenants maintained their position, "ultimately the landlord would be suing the tenant." Nonetheless, he maintained that he did not have the "slightest inkling" that if and when litigation ensued, CL&A would be pulled in as a party.

In its Memorandum and Order of June 8, 2005, the District Court relied on a New Jersey Superior Court case, *Liebling v. Garden State Indemnity*, 767 A.2d 515 (N.J. Super. 2001), in its construction of the policy exclusion.[5] The District

---

[4]West Jersey also agreed that it owed CL&A $247,398.00 in lost commissions. West Jersey thus payed $112,107.20 to CL&A as a result of the settlement.

[5]The District Court also cited *First American Title Ins. Co. v. Lawson*, 827 A.2d 230 (N.J. 2003), and apparently applied this case in conjunction with *Liebling* when interpreting the policy

7

Court concluded that "[t]he first part of the question–whether Gordon had information of any act, error, or omission within his knowledge–is objective." The District Court further concluded that "[t]he second part–whether Gordon reasonably expected this information to result in a lawsuit–is a subjective question that sought to probe his state of mind." Accordingly, the District Court held that "whether the policy exclusion applies here depends on what Gordon 'in fact' believed, and not on the fact that he is an attorney or that he has significant real estate lease experience." The District Court then held that the exclusion was not applicable because "the weight of the evidence at trial indicates that Gordon honestly believed that a legal claim was unlikely."

Consequently, the District Court concluded that Lloyds' denial of coverage was a breach of contract. The District Court further found that CL&A's settlement with West Jersey was

exclusion. The *First American* Court, however, solely considered an insurer's claim that on the basis of the doctrine of equitable fraud, it was entitled to rescind a malpractice policy with respect to all of the attorneys in a limited liability partnership because of the managing partner's knowing misrepresentations in the insurance application and associated warranties. *See id.* at 238-41. Lloyds did in fact raise a rescission claim in the District Court, but it has not renewed that issue on appeal. Accordingly, we do not find *First American* instructive with respect to the issues actually presented in this appeal.

reasonable and entered into in good faith, and that Lloyds had accepted the amount of CL&A's attorneys' fees. Accordingly, on June 8, 2005, the District Court entered judgment for CL&A and in accordance with the terms of the insurance policy ordered Lloyds to pay $247,352.89 (the liability CL&A had assumed for West Jersey's loss plus CL&A's attorneys' fees), less applicable deductibles, to CL&A. Lloyds appealed.[6]

## II.

In an appeal of a final judgment following a bench trial, we exercise plenary review over the District Court's conclusions of law. *Kosiba v. Merck and Co.*, 384 F.3d 58, 64 (3d Cir. 2004). Findings of fact shall not be set aside unless clearly erroneous and due regard must be given to the trial court's judgment as to the credibility of the witnesses. Fed. R. Civ. P. 52(a). The construction of an unambiguous contract is a matter of law and subject to plenary review. *U & W Indus. Supply, Inc. v. Martin Marietta Alumina, Inc.*, 34 F.3d 180, 185 (3d Cir.

---

[6]In addition to contesting the District Court's conclusions with respect to the policy exclusion, Lloyds also argued on appeal: (1) that a claim by West Jersey had actually been made to CL&A prior to the effective date of the policy; and (2) that CL&A had not satisfied its burden of proof with respect to damages. Although we will vacate the District Court's judgment because it erred with respect to its construction of the policy exclusion, we find no merit in either of Lloyd's additional arguments.

1994).

With respect to an issue of state law in a diversity case, when there is no decision from the state's highest court directly on point, we are charged with predicting how that court would resolve the question at issue. *See Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 436 (3d Cir. 2006). When predicting how the state's highest court would resolve the issue, we must take into consideration: (1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue. *See id.* "Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise." *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273-74 (3d Cir. 1985).

III.

Several principles of New Jersey insurance law govern this diversity case. Generally, "when interpreting an insurance policy, courts should give the policy's words their plain, ordinary meaning." *NAV-ITS, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929, 933 (N.J. 2005) (internal quotation marks and citation omitted). "If the policy language is clear, the policy should be interpreted as written, [but] [i]f the policy is ambiguous, the policy will be construed in favor of the insured."

*Id.* (internal citations omitted).

Exclusions in an insurance policy should be narrowly construed. *Id.* at 934 (citing *Princeton Ins. Co. v. Chunmuang*, 698 A.2d 9, 16 (N.J. 1997)). The insurer has the burden of bringing the claim within the exclusion. *Princeton Ins.*, 698 A.2d at 16-17. Nonetheless, "exclusions are presumptively valid and will be given effect if 'specific, plain, clear, prominent, and not contrary to public policy.'" *Id.* at 17 (quoting *Doto v. Russo*, 659 A.2d 1371, 1378 (N.J. 1995)); *see also Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 713 A.2d 1007, 1013-14 (N.J. 1998) (finding that a policy exclusion precluded coverage because it was "clear and unambiguous" and not contrary to public policy).

New Jersey courts also "endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured." *See NAV-ITS*, 869 A.2d at 934 (internal quotation marks and citation omitted). The New Jersey Supreme Court has "recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, and *in exceptional circumstances*, when the literal meaning of the policy is plain." *See id.* (internal citations omitted) (emphasis added).

The New Jersey doctrine allowing the reasonable expectations of the insured to override the plain meaning of a policy in exceptional circumstances, while often stated, has

11

rarely been applied by the New Jersey Supreme Court. Nonetheless, in *Sparks v. St. Paul Insurance Co.*, 495 A.2d 406 (N.J. 1985), the New Jersey Supreme Court held that a clear policy exclusion which did not "conform to the objectively reasonable expectations of the insured" *and* which was "violative of the public policy of [New Jersey]" could be construed in a manner which varied from its plain terms. *See id.* at 414-16.

In light of these decisions, we predict that the New Jersey Supreme Court would hold that a clear and unambiguous policy exclusion should be applied according to the plain language of the exclusion unless it violates public policy as well as the objectively reasonable expectations of the insured. In other words, we hold that under New Jersey law, the "exceptional circumstances" that might allow a court to construe a clear and unambiguous policy exclusion in accordance with the objectively reasonable expectations of the insured, rather than in accordance with the plain language of the exclusion, arise only when a literal application of the exclusion would also violate public policy. *Cf. Princeton Ins.*, 698 A.2d at 17; *cf. also Am. Motorists*, 713 A.2d at 1013-14.

IV.

As a matter of law, we hold that the policy exclusion in this case is clear and unambiguous, and that its plain language mandates a subjective test for the first part of the necessary inquiry and an objective test for the second part of the inquiry.

12

As an initial observation, such a test flows directly from the text of the exclusion ("provided that the insured had no knowledge of any suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance"). The first condition in the exclusion is satisfied if *the insured had knowledge* of the relevant suit, act, error, or omission. Accordingly, we conclude that this part of the exclusion depends on the insured's actual knowledge, or subjective awareness, of the relevant suit, act, error, or omission. The second condition in the exclusion, in contrast, is satisfied if the suit, act, error, or omission *might reasonably be expected* to result in a claim or suit. This language does not require that the insured actually form such an expectation, and we conclude that this part of the exclusion gives rise to an objective test: whether a reasonable professional in the insured's position might expect a claim or suit to result.

These conclusions are supported by our analysis in *Selko v. Home Insurance Company*, 139 F.3d 146 (3d Cir. 1998).[7] The attorney malpractice policy in *Selko* stated that an act, error, or omission that had occurred prior to the policy period would be covered "provided that prior to the effective date of this policy . . . the insured had no basis to believe that the insured

---

[7]Although *Selko* was decided under Pennsylvania law, we find our reasoning in that case instructive on the textual issues in the present case.

13

had breached a professional duty." *Id.* at 149 n.1. We held that the "plain meaning" of this "basis to believe" clause gave rise to a two-step inquiry: (1) the subjective question of whether the insured knew of certain facts; and (2) the objective question of whether a reasonable lawyer in possession of such facts would have had a basis to believe that the insured breached a professional duty. *Id.* at 151-52. We further held that this "mixed standard . . . is not merely one of several possible interpretations but is . . . the interpretation plainly signaled by the contract language." *Id.* at 152 n.3. In short, we held that this mixed standard arose plainly and unambiguously from the language of the exclusion.

Notably, in *Selko* this reformulation of the policy exclusion into a two-part inquiry required an inferential step, since the policy language itself contained a unitary clause (that "the insured had no basis to believe that the insured had breached a professional duty"). In the present case, no such inferential step is required, because the structure and text of the exclusion itself incorporates such a two-part inquiry.

Finally, we note that the New Jersey Superior Court's decision in *Liebling*, upon which the District Court relied, specifically addressed our decision in *Selko*. Notably, the *Liebling* court did not contradict our decision in *Selko* with respect to what the plain language of such a policy exclusion would require. The attorney malpractice policy in *Liebling* provided that "[w]e do not insure here any claim . . . of which . . . [a]ny insured, at the inception date of this contract, knew or

14

reasonably could have foreseen that any such act, error, or omission might be expected to give rise to a claim otherwise insured here." 767 A.2d at 522. The *Liebling* court observed that in *Selko*, we construed a "similarly worded exclusion[] as creating an objective standard for denial of coverage . . . ." *Id.* (citing *Selko,* 139 F.3d at 146). The *Liebling* court held that "[r]eturning to the language of the exclusion discussed in *Selko*, we acknowledge that the court's interpretation is sound as a matter of logic." *Id.* at 523. Consequently, the *Liebling* court endorsed our reasoning in *Selko* insofar as it was based on the plain implications of the language of the exclusion.

The *Liebling* court, however, went on to reach a different conclusion about the applicable test:

> Nevertheless, we reject [the mixed test in *Selko*] because it does not meet the reasonable expectations of an attorney seeking the protection afforded by malpractice insurance. That view was eloquently articulated in *Estate of Logan v. Northwestern Nat. Cas. Co.*, 144 Wis.2d 318, 424 N.W.2d 179 (1988), an opinion with which we entirely agree.

*Id*. This passage implies that the *Liebling* court did not hold, *contra* to *Selko*, that the language of the exclusion in *Liebling* was ambiguous. Nor did the *Liebling* court hold that the language of the exclusion had a different plain meaning than the one we identified in *Selko*. Rather, the *Liebling* court apparently

15

relied in this passage on the New Jersey doctrine that in exceptional circumstances, even the plain language of an exclusion can be set aside if it is contrary to the objectively reasonable expectations of the insured.

The *Liebling* court subsequently made its reliance on this doctrine explicit. At the end of the section discussing the exclusion, the court noted that the New Jersey Supreme Court had stated that "'[a]t times, even an unambiguous [insurance] contract has been interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured[.]'" *Id.* at 524 (citing *Werner Indus., Inc. v. First State Ins. Co.*, 548 A.2d 188 (N.J. 1988)). The *Liebling* court then stated:

> Based on that settled principle and the reasoning of the Supreme Court of Wisconsin in *Logan*, we hold that the "reasonably could have foreseen" exclusion in Garden State's policy shall be deemed to mean that coverage may be denied only if the insured knew or believed that there had been a deviation from professional standards and that based on all the known circumstances it was likely that a malpractice claim would be made.

*Id.* Accordingly, the *Liebling* court's reasoning depended on the proposition that the exclusion should be interpreted in a manner contrary to its plain meaning in order to fulfill the reasonable expectations of the insured. We turn now to the application of that doctrine to the exclusion in this case.

16

V.

In accord with our analysis of the decisions of the New Jersey Supreme Court, and because the exclusion in this case was clear and unambiguous, we must determine if applying the exclusion according to its plain meaning would violate public policy as well as the objectively reasonable expectations of the insured.

A.

Both *Sparks* and a companion case, *Zuckerman v. National Union Fire Insurance Co.*, 495 A.2d 395 (N.J. 1985),[8] considered the public policy implications of exclusions in "claims made" insurance policies. In *Zuckerman*, the New Jersey Supreme Court held that an attorney malpractice policy that afforded "unlimited retroactive coverage, excluding only those claims based on past conduct that the insured knew, or could have reasonably foreseen, might lead to a claim or suit" was reasonable[9] and not a violation of public policy. *See* 495 A.2d at 403-05. The *Zuckerman* court reasoned:

> The reasonableness of excluding claims based on prior conduct that the insured could reasonably have foreseen might serve as the basis for a future

---

[8]The *Liebling* court did not cite or discuss *Sparks* or *Zuckerman*.

[9]This is not the same inquiry as to whether the objectively reasonable expectations of the insured were fulfilled. That issue did not arise in *Zuckerman*. *See* 495 A.2d at 403-04 ("There is no suggestion that appellant's reasonable expectations of coverage were unfulfilled.").

17

> claim is apparent. The insurance company is
> entitled to protect itself against the professional
> who, recognizing his past error or omission,
> rushes to purchase a "claims made" policy before
> the error is discovered and a claim asserted
> against him. This insurance company concern has
> been termed the "moral hazard."

*Id.* at 403 n.3 (citations omitted). Further noting that the scope of the coverage was "consistent with the coverage customarily provided by 'claims made' policies" and that "[t]he retroactive coverage [was] substantially unrestricted," the *Zuckerman* court found "no considerations of public policy that would inhibit our enforcement of the 'claims made' policy issued to the appellant." *Id.* at 404.

In *Sparks*, however, the New Jersey Supreme Court found that a different exclusion in a "claims made" medical malpractice policy did violate public policy. 495 A.2d at 414-16. The *Sparks* court concluded that the exclusion in that case rendered the policy at issue "substantially different from the standard 'claims made' policy." *Id.* at 414. Specifically, the court observed that due to the terms of the exclusion:

> During the first year that the policy was in force,
> it provided no retroactive coverage for
> occurrences prior to the effective date of the
> policy. Thus, it afforded the insured only minimal
> protection against professional liability claims.
> Only claims asserted during the policy year, based
> on negligence that occurred during the policy
> year, and that were subsequently communicated
> to the company during the policy year were under

the umbrella of coverage.

*Id.* at 414-15.  The court further reasoned:

> The realities of professional malpractice, however, suggest that it would be the rare instance in which an error occurred and was discovered with sufficient time to report it to the insurance company, all within a twelve-month period.  The victims of professional malpractice are frequently unaware of any negligence until their injury becomes manifest long after the error or omission was committed.

*Id.* at 415.  As a general principle of public policy, the court concluded that "[b]ecause insurance contracts are contracts of adhesion, the terms of which are not customarily bargained for, courts have a special responsibility to prevent the marketing of policies that provide unrealistic and inadequate coverage." *Id.* at 415.  Accordingly, the court held that "[t]o enforce policies that provide such unrealistically narrow coverage to professionals, and, derivatively, to the public they serve, would in our view cause the kind of broad injury to the public at large contemplated by the doctrine that precludes the enforcement of contracts that violate public policy." *Id*.

Taken together, *Zuckerman* and *Sparks* imply that an exclusion in a "claims made" policy which is properly designed to prevent the "moral hazard" of a professional "recognizing his past error or omission" and "rush[ing] to purchase a 'claims made' policy before the error is discovered and a claim is asserted against him" is reasonable and not a violation of public policy.  However, the policy must in fact provide retroactive

coverage, and therefore the terms of the exclusion cannot operate as a complete bar to retroactive coverage.

In light of these principles, we hold that applying the exclusion in the present case according to the mixed subjective-objective standard arising under the exclusion's plain language would not constitute a violation of New Jersey public policy. Again, although decided under Pennsylvania law, we find our reasoning in *Selko* instructive on this issue.

Specifically, we explained in *Selko* why using an objective standard for the second part of the inquiry was reasonable in the context of a "claims made" policy:

> It is reasonable for the insurer to refuse coverage for claims based on preexisting but undisclosed misconduct by an insured attorney. Nor is it unreasonable to tie such an exclusion to an even-handed "reasonable attorney" assessment, rather than to speculation concerning the individual attorney's subjective understanding. The latter approach, by rewarding the attorney who is ignorant of the law, or by encouraging disingenuous, after-the-fact justifications, could result in totally capricious and unpredictable outcomes. Under the mixed standard we believe the Pennsylvania court would adopt, coverage does not turn on psychoanalysis, yet the attorney is not made accountable for matters he did not know about, nor for known matters that would not cause a reasonable attorney to foresee a claim.

139 F.3d at 152. This same reasoning can be applied to any

similar exclusion in a "claims made" professional liability policy: an exclusion which depended on a subjective standard for the second part of the inquiry would reward ignorance and encourage professionals to engage in disingenuous statements and after-the-fact justifications, which in turn would lead to unpredictable outcomes.

Moreover, implicit in our reasoning in *Selko* was the same concern for "moral hazards" as expressed by the New Jersey Supreme Court in *Zuckerman*. In particular, a professional who became subjectively aware of an error and who then rushed to obtain a "claims made" policy might later disingenuously assert that he or she was not subjectively aware of the possibility that a claim or suit might arise from the error. Notably, this moral hazard does not exist if the professional is not subjectively aware that an error has occurred, because in that case the professional would have no reason to anticipate a need for professional liability insurance. Conversely, however, once a professional is subjectively aware of an error, the professional has an incentive to seek new or additional professional liability insurance. This is true even if the professional does not know whether or not the error may lead to an actual claim. Further, even if in truth the professional was subjectively aware that the error might lead to an actual claim, as we noted in *Selko*, under a subjective standard the professional would have a greater hope of disingenuously convincing a court that he or she was not aware of the legal implications of the error.[10]

_____

[10]We note that the District Court's finding with respect to Gordon's subjective belief about the likelihood of a claim against CL&A depended heavily on Gordon's own self-serving testimony. We further note that although the District Court's determinations as to credibility are entitled to our deference, on

21

Accordingly, a policy exclusion which requires an objective test for the second part of the necessary inquiry constitutes a reasonable attempt by the insurer to limit this moral hazard. Consequently, in light of the reasonable concerns of insurers as expressed in *Zuckerman*, we predict that the New Jersey Supreme Court would hold that a mixed subjective-objective test, arising under an exclusion in a "claims made" professional liability policy, does not violate New Jersey public policy.

### B.

Because we predict that a mixed subjective-objective test arising under an exclusion in a "claims made" policy would not violate New Jersey public policy, we further predict that the New Jersey Supreme Court would hold that the extraordinary circumstances in which the plain language of the exclusion might give way to the objectively reasonable expectations of the insured do not exist in this case. We further predict that in any event, the New Jersey Supreme Court would also hold that a mixed subjective-objective test does not violate the objectively reasonable expectations of the insured.

The New Jersey Supreme Court in *Sparks* explained why

---

the basis of the record before us, we have significant doubts about the plausibility of Gordon's testimony. We note in particular that Wolf, apparently with Gordon's knowledge, had perceived the need to offer a legal theory–"mutual mistake"–which apparently was designed to shift partial responsibility for CL&A's drafting errors to the tenants.

the exclusion in that case, in addition to violating public policy, also violated the reasonable expectations of medical professionals because it in effect operated to entirely bar retroactive claims. The *Sparks* court reasoned that absent unusual circumstances, a medical professional could reasonably opt for the prospective coverage provided by "occurrence" policies (in which claims arising from an error which happened during the policy period would be covered regardless of when the error was actually discovered) or for the retroactive coverage by "claims made" policies, but could not reasonably opt for a policy which provided neither prospective nor retroactive coverage. *See* 495 A.2d at 415. This reasoning is inapplicable to the present case, because Lloyd's policy generally provided retroactive coverage.

As previously noted, however, the New Jersey Superior Court in *Liebling* held that the mixed subjective-objective test which we adopted in *Selko* would not meet the reasonable expectations of the insured. Although we acknowledge that the Superior Court's decisions are entitled to substantial weight in our prediction of New Jersey law, its decisions are not controlling, and we conclude that in this instance, we have sufficient indications that the New Jersey Supreme Court would rule otherwise.[11]

_____

[11]We note that the New Jersey Supreme Court summarily denied certification in *Liebling*. 782 A.2d 424 (N.J. 2001) (table). We give no weight to this denial of certification because the relevant legal conclusion in *Liebling* was not dispositive in *Liebling* itself. Although the *Liebling* court held that the insurer must show that the insured subjectively believed that it was likely a claim would be made, the court also found that the insured did in fact have such a subjective belief. *See* 767 A.2d at 525. Moreover, the *Liebling* court found in the alternative

In its analysis of the reasonable expectations of the insured, the *Liebling* court did not rely on *Sparks*, nor on any other New Jersey cases, but rather on *Logan*, a Wisconsin Supreme Court case. *See* 767 A.2d at 523-24. The attorney malpractice policy in *Logan* allowed retroactive coverage provided that before the policy's effective date, "the Insured had no basis to believe that the Insured had breached a professional duty." 424 N.W.2d at 185. The insurer in *Logan* argued that "a claim should be excepted from coverage if the insured knew or should have known that the insured had breached a professional duty." *Id.* at 186.

The Wisconsin Supreme Court reasoned that this objective standard, as proposed by the insurer, would be "inconsistent with the purpose of the policy and what an insured would have understood the exception to provide." *Id.* Specifically, the *Logan* court held that "whether an insured had a 'basis to believe' must be tested by whether the insured knew or believed that the insured had committed a breach of his or her

_____

that "no reasonable attorney [would] have felt secure from a claim." *Id.* Accordingly, a reversal by the New Jersey Supreme Court with respect to the relevant point of law would not have affected the *Liebling* court's ultimate conclusion that the policy exclusion did apply. Further, the *Liebling* court also held that the insured was entitled to recission of the entire policy on the ground of equitable fraud (due to the insured's knowingly false answer to an application question regarding the insured's awareness of possible claims). *Id.* Consequently, for multiple reasons, a reversal on the relevant point of law would not have led to a different outcome in *Liebling*, and therefore we decline to attach any significance to the New Jersey Supreme Court's decision not to review the Superior Court's judgment in that case.

24

professional duty." *Id*. In support of this holding, the *Logan* court reasoned:

> The difficulty with applying an objective standard is apparent when examined in the context of a hypothetical error or omission by an attorney. For example, an attorney commits a breach of his or her professional duty by not filing a suit within the one year statute of limitations. The attorney did not file within the year because he or she believed erroneously that the statute of limitations was three years. The statute was specific, and the attorney should have known that the statute of limitations was one year. Under an objective standard, any subsequent policy would except coverage for a claim based on failing to file the suit within one year because, prior to the effective date of the subsequent policy, the attorney should have known that he or she had breached a professional duty by failing to file the suit within the one year statute of limitations. Thus, because the attorney did not know the correct statute of limitations, but should have known the correct statute, the attorney not only committed a breach of his or her professional duty, but he or she is also denied insurance coverage.

*Id*. In short, the *Logan* court was noting that retroactive coverage for professional errors would be illusory if such coverage could be denied on the ground that a reasonable professional would have known that the error had been committed prior to obtaining the policy.

In that sense, however, the *Logan* court was addressing only what we identified in *Selko* as the first part of the necessary inquiry–whether the professional was subjectively aware of the relevant error. In contrast, the hypothetical scenario considered by the *Logan* court did not address the second part of the inquiry–whether the error could reasonably be expected to result in a claim. Accordingly, the concerns expressed by the *Logan* court on the basis of this hypothetical scenario do not extend to a case in which a professional *is* subjectively aware that he has committed a professional error, and the only remaining question is whether that error could be expected to result in a claim.

In applying *Logan*, the *Liebling* court failed to draw this distinction. Rather, the *Liebling* court concluded:

> Based on . . . the reasoning of the Supreme Court of Wisconsin in *Logan*, we hold that the "reasonably could have foreseen" exclusion in [the] policy shall be deemed to mean that coverage may be denied only if the insured knew or believed that there had been a deviation from professional standards *and that based on all the known circumstances it was likely that a malpractice claim would be made*.

767 A.2d at 524 (emphasis added). Once the insured is subjectively aware that "there ha[s] been a deviation from professional standards," however, the concerns of the Wisconsin Supreme Court in *Logan* are no longer applicable. In contrast, the moral hazard identified by the New Jersey Supreme Court in *Zuckerman* does become applicable at that point, because a professional already has an incentive to seek new or additional retroactive insurance once the professional is aware of the error,

and even if the professional is unsure whether a claim will result.

In short, by extending the reasoning of the *Logan* court to the second part of the necessary inquiry, the *Liebling* court failed to give due regard to the reasonable purposes that can be served by exclusions in "claims made" policies as explained by the New Jersey Supreme Court in *Zuckerman*.[12] Consequently, we conclude that we have sufficient indications from the New Jersey Supreme Court that it would hold, *contra* to *Liebling*, that the mixed subjective-objective test arising under the plain language of the exclusion in our case did not violate the objectively reasonable expectations of the insured.

VI.

---

[12]We note that the policy in *Zuckerman* excluded "only those claims based on past conduct that the insured knew, or could have reasonably foreseen, might lead to a claim or suit." *See* 495 A.2d at 403. Although the *Zuckerman* court did not address this issue, it appears to us that this exclusion gave rise to an objective test, insofar as it excluded claims based on past conduct that the insured "could have reasonably foreseen" might lead to a claim. Indeed, the *Zuckerman* court used this same formulation when addressing the reasonableness of such exclusions. *See id.* at 403 n.3 ("The reasonableness of excluding claims based on prior conduct that the insured could reasonably have foreseen might serve as the basis for a future claim is apparent."). Accordingly, although the *Zuckerman* court did not specifically address the reasonableness of an objective test for the second part of the necessary inquiry, we find it notable that the *Zuckerman* court approved what appears to us to be an objective test.

In sum, we predict that the New Jersey Supreme Court would hold that the mixed subjective-objective test arising from the clear and unambiguous policy exclusion in our case violates neither New Jersey public policy nor the objectively reasonable expectations of the insured. Accordingly, we further predict that the New Jersey Supreme Court would hold that this policy exclusion should be applied according to its plain language. Consequently, the District Court erred by holding that it should apply an objective test to the first part of the inquiry and a subjective test to the second part of the inquiry, because given the plain language of the exclusion, the District Court should have applied a subjective test to the first part of the inquiry and an objective test to the second part of the inquiry.

Because the District Court's dispositive reasoning depended on its application of an erroneous test, we will vacate the District Court's judgment and remand for further proceedings.[13]

---

[13]We note that given the record before us, we have some doubt about whether a triable issue remains after our holding. In particular, in our view a reasonable professional in Gordon's position, with Gordon's knowledge that CL&A had committed the drafting error and that the tenants had rejected CL&A's "mutual mistake" theory, would have expected that a claim or suit against CL&A might arise. Nonetheless, we will leave to the District Court the decision as to whether it should grant judgment as a matter of law in favor of Lloyds, or whether a new trial conducted in light of the proper standard is warranted.