OPINION
BARRY, Circuit Judge.
Colliers Lanard & Axilbund (“Colliers”), a commercial real estate brokerage firm, held a “claims made” professional liability insurance policy issued by Lloyds of London (“Lloyds”). The policy provided coverage for claims made against Colliers for a one-year term beginning on November 4, 2000, “arising from services rendered” anytime after November 4,1992, “provided that ... the [i]nsured had no knowledge of ... any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance.” (Supplemental Appendix, “SA”, at 31.)
At issue is whether the policy required Lloyds to defend and indemnify Colliers against an action brought by West Jersey Medical and Professional Plaza, LLC (“West Jersey”) alleging that Colliers’s drafting errors in two commercial leases caused it damages exceeding $200,000 (the “underlying action”). The underlying action was filed in January 2001, and the errors that gave rise to it occurred in 1998 and 1999. The parties stipulated that Colliers’ general counsel, George Gordon, had knowledge of the drafting errors on August 29, 2000, when he applied for the Lloyds policy, but Gordon contends that he did not expect the errors to result in a claim against Colliers.
After a two-day trial, the District Court instructed the jury that “[yjour job in this case is to determine whether Colliers ... might reasonably] expect a claim or a suit as of the date of the signing of the application for insurance,” and that it was “to consider this question applying the objective standard.” (Joint Appendix, “JA”, at 276.) The jury answered “[y]es,” (id. at 282) and found in favor of Lloyds. On appeal, Colliers contends that the Court improperly instructed the jury because the relevant question was whether Colliers subjectively expected a suit to result from its drafting errors. Our earlier decision in this case, Colliers Lanard & Axilbund v. Lloyds of London, 458 F.3d 231 (3d Cir.2006) (“Colliers I”), interpreted New Jersey law and specifically held to the contrary: assuming, as is the case here, that the insured had knowledge of the error, “the exclusion gives rise to an objective test [ — ] whether a reasonable professional in the insured’s position might expect a claim or suit to result.” Id. at 237. Colliers argues that our prior holding is incorrect in the wake of the Supreme Court of New Jersey’s decision in Liberty Surplus Insurance Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 916 A.2d 440 (2007). Alternatively, Colliers asserts that the jury verdict was unsupported by the evidence. We will affirm.
I. Facts & Background
A. The Underlying Action
West Jersey owns and operates a medical office complex in Voorhees, New Jersey; Colliers was the leasing broker for that property. In that role, Colliers was responsible for drafting lease agreements between West Jersey and the tenants it secured on West Jersey’s behalf. Jason Wolf, a senior associate at Colliers, managed the West Jersey account, and in 1998 and 1999 recruited Schaffer Medical Associates (“Schaffer”) and Dr. Albert R. Fran *197 cesconi as tenants. West Jersey intended for each tenant to pay the full cost of operations for its part of the building— including maintenance, taxes, and insurance — but the leases as drafted did not reflect that intention. Instead, Wolf (or someone else at Colliers) “mistakenly entered ... incorrect terms for the cost of operations into both leases.” (JA at 64.) Gordon, Colliers’ general counsel, reviewed the leases but did not notice the errors; Steve Shapiro, the principal shareholder of West Jersey, likewise reviewed (and later signed) the leases without discovering the errors.
In July 2000 — approximately one and a half years after the leases were executed— Shapiro informed Wolf that West Jersey was not receiving the full amount of operating expenses from Schaffer and Dr. Francesconi. Shapiro noted that he had reread the leases and discovered the drafting error. He asked Wolf and Gordon to “prepare letters to the tenants ... suggesting ... that all parties including the tenants failed to discover the ‘mutual mistake[s]’ when signing the lease[s], and requesting that the tenants agree to pay West Jersey its lost revenue.” (Id. at 65.) On July 14, 2000, Gordon drafted a letter to each tenant, and sent the letters out under Wolfs name.
On July 24, 2000, Colliers received a letter from Dr. Schaffer stating: “I take issue with your contention that there was a mutual mistake in drafting the lease. Clearly there was no mutual mistake.” (SA at 7.) Dr. Schaffer further directed all future “discussions regarding this matter” to her attorney. (Id.)[1] The parties stipulated that:
Upon receipt of [Dr. Schaffer’s] letter[ ] rejecting the proposal [to alter the lease and pay back rent], George Gordon presumed that unless there would be some change of heart or subsequent negotiation [with] the tenants, the tenants were not going to pay and would have to be forced to do so through legal action.
(JA at 65-66.) Although Shapiro indicated that he would be exploring avenues to recover the lost rent, he neither told Gordon or Wolf that he was contemplating a suit against Colliers nor affirmatively indicated that a suit was out of the question. The drafting errors allegedly cost West Jersey $214,052.
B. The Lloyds Policy
Colliers completed an application for Lloyds real estate errors and omissions liability insurance on August 29, 2000. Gordon was responsible for providing the answer to question twenty on the application, which asked if Colliers was “aware of any act, error, omission or other circumstances which might reasonably be expected to be the basis of a claim against the applicant.” (SA at 12). He answered “no.” Lloyds subsequently issued a “claims made” policy, effective November 4, 2000 to November 4, 2001. The “policy applie[d] to claims first made against the insured and reported to [Lloyds] during the policy period arising from services rendered ... subsequent [to November 4, 1992] ... provided that the [i]nsured had no knowledge of any ... act or error or omission ... which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance.” (SA at 31) (emphasis added).
*198 C. The Present Action
On January 10, 2001, West Jersey advised Colliers that it was going to pursue legal relief against all parties related to the leases, including Colliers. Two weeks later, Colliers was served with the complaint West Jersey had filed in the Superi- or Court of New Jersey, and Gordon tendered the claim to Lloyds pursuant to the policy. Lloyds denied Colliers’ claim for defense and indemnification, stating that Colliers was aware of circumstances which might reasonably have been expected to result in a claim or suit as of the date of signing the insurance application.[2]
On December 30, 2002, Colliers filed this action against Lloyds, alleging that Lloyds breached the terms of its policy by denying coverage, and seeking to recover the costs that it had incurred in defending and settling the underlying action. On April 18, 2005, the District Court conducted a bench trial. Gordon testified that, at the time he filled out the insurance application, he did not have the “slightest inkling” that West Jersey would sue Colliers. Colliers 1, 458 F.3d at 235. The Court concluded, inter alia, that “whether the policy exclusion applies here depends on what Gordon ‘in fact,’ ” or subjectively, “believed” when he was filling out the application. Id. Consequently, the Court found “that the exclusion was not applicable because the ‘weight of the evidence at trial indicates that Gordon honestly believed that a legal claim was unlikely,’ ” and concluded that Lloyds’ denial of coverage was a breach of contract. Id.
On Lloyds’s appeal of the District Court’s decision, we vacated the judgment and remanded for further proceedings. Interpreting New Jersey law, we held that the policy’s exclusion was unambiguous and that it, therefore, should be interpreted in accordance with its plain language. We stated:
As a matter of law, we hold that the policy exclusion in this case is clear and unambiguous, and that its plain language mandates a subjective test for the first part of the necessary inquiry and an objective test for the second part of the inquiry.... The first condition in the exclusion is satisfied if the insured had knowledge of the relevant ... act, error, or omission. Accordingly ... this part of the exclusion depends on the insured’s actual knowledge, or subjective awareness, of the relevant ... act, error, or omission. The second condition in the exclusion, in contrast, is satisfied if the ... act, error, or omission might reasonably be expected to result in a claim or suit. This language does not require that the insured actually form such an expectation, and we conclude that this part of the exclusion gives rise to an objective test: whether a reasonable professional in the insured’s position might expect a claim or suit to result.
Id. at 237 (emphasis in original). We further explained that our interpretation was consistent with New Jersey public policy. “LA] policy exclusion which requires an objective test for the second part of the necessary inquiry constitutes a reasonable attempt by the insurer to limit ... moral hazard.” Id. at 241. Were it otherwise, “a professional who became subjectively aware of an error and who then rushed to obtain a ‘claims made’ policy might later disingenuously assert that he or she was not subjectively aware of the possibility *199 that a claim or suit might arise from the error.” Id. at 240.
We remanded for further proceedings, noting “that given the record before us, we have some doubt whether a triable issue remains after our holding. In particular, in our view a reasonable professional in Gordon’s position ... would have expected that a claim or suit against [Colliers] [may] arise.” Id. at 244 n. 13. “Nonetheless, we [left] to the District Court the decision as to whether it should grant judgment as a matter of law in favor of Lloyds, or whether a new trial conducted in light of the proper standard [was] warranted.” Id.
Colliers and Lloyds subsequently filed cross motions for summary judgment. Before denying both motions, the District Court requested letter briefing on the New Jersey Supreme Court’s decision in Liberty. Colliers argued that the Liberty decision was inconsistent with our holding in Colliers I, and that it required the Court to ask only whether Gordon was subjectively aware that the drafting error could result in a lawsuit against Colliers. The Court rejected that argument.
A two-day trial featured testimony from Gordon, Wolf, Shapiro, and a Lloyds underwriter. Because the parties stipulated that Gordon and Wolf were aware of the drafting errors at the time Gordon completed the Lloyds application, the only question at trial was whether a “reasonable professional in [their] position might expect a claim or suit to result.” Id. at 237. The District Court instructed the jury consistent with our earlier decision, and the jury found in favor of Lloyds.
II. Discussion
Colliers renews its argument that the jury was improperly instructed. “We exercise plenary review to determine whether jury instructions misstated the applicable law,” Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc., 180 F.3d 542, 549 (3d Cir.1999), which, in this case, is “New Jersey insurance law.” Colliers I, 458 F.3d at 236.
We note, at the outset, that Colliers I is the law of the case, and that the decision directed the District Court to instruct the jury precisely as it did. See 458 F.3d at 243-44. Our inquiry, however, does not end there. Although “Third Circuit Internal Operating Procedure 9.1 prohibits panels of this Court from overruling the holdings of precedential opinions of previous panels,” we are “ ‘free to reexamine the validity of our state law interpretation based on subsequent decisions of the state supreme court.’ ” Jaworowski v. Ciasulli, 490 F.3d 331, 332 n. 1 (3d Cir.2007) (quoting Nationwide Ins. Co. v. Patterson, 953 F.2d 44, 46 (3d Cir.1991)); see Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 543, 61 S.Ct. 347, 85 L.Ed. 327 (1941) (“until such time as a case is no longer sub judice, the duty rests upon federal courts to apply state law ... in accordance with the then controlling decision of the highest state court”). Such reexamination is consistent with our task “when we sit in diversity ... to seek to eliminate inconsistency between the federal and state courts in the application of state substantive law.” Nationwide Ins. Co., 953 F.2d at 47.
Colliers asserts that we should reconsider the holding of Colliers I in the wake of Liberty, which was decided on February 28, 2007.[3] That argument stems from an over-reading of Liberty, which, properly considered, is entirely consistent with our earlier decision. In Liberty, a law firm *200 failed to file an action on behalf of its client within the statutory period, and the action was consequently dismissed. One month after the Appellate Division affirmed the dismissal, the firm applied for professional liability “claims made” coverage from the insurer. 916 A.2d at 444. The application asked a familiar question, namely whether “any lawyer to be insured under this poliey[ ] [had] knowledge of any circumstance, act, error or omission that could result in a professional liability claim,” and the firm answered “no.” Id. When the client filed a legal malpractice claim against the firm, it sought defense and indemnification from the insurer. The insurer denied coverage, stating “that at the time [the firm] completed its insurance application, [it] ‘had knowledge of a circumstance, act, error or omission that could result in a professional liability claim’ against it.” Id. at 442. The insurer subsequently sought declaratory relief against the firm, “seeking a determination that [the] legal malpractice claim was not covered under the claims made policy.” Id.
The parties in Liberty agreed that the application question and a similarly-worded policy exclusion were subjective in nature, and that the insurer could only deny coverage if the firm actually believed that a claim might arise from its error or omission (at the time it filled out the application). Despite the firm’s assertions that it did not believe that its failure to file a timely action would result in a professional liability claim, the trial court granted summary judgment in favor of the insurer. See id. at 445 (“under the unique circumstances of this case, the law film could not have conceived that there was no reasonable basis to believe a professional duty had been breached”). The Supreme Court of New Jersey, then, “granted certification ... to determine whether summary judgment may be granted in favor of an insurer when an application for insurance contains a subjective question whether the insured had knowledge of any ... error or omission that could result in a legal malpractice claim against it and the insured answers ‘no.’ ” Id. at 441. In other words, the court sought to review whether the trial court properly concluded that there was no genuine issue of fact regarding the insured’s knowledge of a potential action, even when the insured denied having such knowledge. Liberty, therefore, is a case about the New Jersey summary judgment standard, and not about whether the typical exclusion in a “claims made” policy is to be evaluated under a subjective or objective standard.
 That is made crystal clear by the language of the decision itself. It states in relevant part:
[W]e agree ... that the question on the application that asked if any insured had ‘knowledge of any circumstance, act, error or omission that could result in a professional liability claim’ was subjective in nature. We note, however, that in contrast to the subjective question on the application the policy language that [provides coverage only if] ‘the [i]nsured had no reasonable basis to believe that the [i]nsured had breached a professional duty or to foresee that a claim would be made against the [i]nsured’ appears to be objective. Because the application of a subjective standard is more rigorous for [the insurer] to meet, and because both parties urge that a subjective standard governs, we apply a subjective standard concerning [the firm’s] knowledge when it applied for malpractice insurance.
Id. at 445-46 (emphasis added). Despite Colliers’ reliance on Liberty, the case expressly does not hold that the policy exclusion bars coverage only if the insured subjectively believed that a claim against it *201 was forthcoming. Because the parties agreed on the standard, the decision does not even address that issue, except to note, in dicta, that the exclusion “appears to be objective.” Id. at 446. Liberty does not alter our holding in Colliers I.[4]
III. Conclusion
For the foregoing reasons, we will affirm the judgment of the District Court.

. Dr. Francesconi's attorney responded to Colliers’ letter via a letter dated August 25, 2000, which ”den[ied] any such mistake on our part. If any mistake regarding the rent provisions occurred, it was unilaterally made by or on behalf of the landlord." (SA at 5.) Gordon testified that he did not see the "Francesconi letter” prior to reviewing the Lloyds insurance application. (JA at 78.)

. The parties stipulated that West Jersey and Colliers settled that action when Colliers agreed to offset $135,290.80 in commissions owed lo it by West Jersey, and that Colliers incurred $112,062 in legal fees.

. Our decision in Colliers I was filed on August 11, 2006. It is neither discussed nor cited in Liberty.

. Alternatively, Colliers contends that the jury verdict was not supported by the evidence. However, because it failed to move for a directed verdict pursuant to Federal Rule of Civil Procedure 50(a) and likewise failed to file a Rule 50(b) motion after the jury returned its verdict, Colliers cannot now seek to challenge the sufficiency of the evidence. See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc. 546 U.S. 394, 403, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006) ("a party is not entitled to pursue a new trial on appeal unless that party makes an appropriate postverdict motion in the district court”). In any event, the parties agree that as of July 2000, Gordon — a lawyer with decades of experience — knew that drafting errors by his company caused West Jersey to lose out on substantial expected revenue. Given those facts, the jury's conclusion that a reasonable professional in Gordon's position would have reasonably expected a suit when he applied for insurance one month later is amply supported by the evidence.