No. 95,942

AMERICAN SPECIAL RISK MANAGEMENT CORPORATION and CONTINENTAL CASUALTY COMPANY, *Appellants*, v. WILLIAM CAHOW and PEOPLES BANK, *Appellees*, v. PROGRESSIVE CASUALTY INSURANCE COMPANY, *Appellee*.

(192 P.3d 614)

Opinion filed September 12, 2008.

*Christopher J. Sherman*, of Payne & Jones, Chartered, of Overland Park, argued the cause, and *Michael B. Lowe*, of the same firm, and *Daniel F. Church* and *Joseph W. Hemberger*, of McAnany, Van Cleave & Phillips, P.C., of Roeland Park, were with him on the briefs for appellants Continental Casualty Company and American Special Risk Management Corporation.

*Paul Hasty, Jr.*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *Derek G. Johannsen*, of the same firm, was with him on the brief for appellee Progressive Casualty Insurance Company.

The opinion of the court was delivered by

LUCKERT, J.: This appeal examines the standard to be applied when an insurance company denies coverage because the insured failed to disclose a potential claim on an application for insurance. Specifically, we must determine: When an application for insur-

ance asks for the identification of "any facts, circumstances, or situations . . . which could reasonably be expected to give rise to a claim" and the policy excludes any claim arising from an undisclosed risk, must the insurance company invoking the exclusion and denying coverage establish that the applicant (a) committed fraud; (b) failed to disclose information that the applicant subjectively perceived as a potential risk; (c) failed to disclose known information that an objective person would reasonably perceive as a potential risk; or (d) failed to discover circumstances that reasonably should have been known and which, if known, would be perceived as a potential risk by a reasonable person?

We hold that the language of the policy and application—specifically, the request for disclosure of facts, circumstances, or situations which could reasonably be expected to give rise to a claim—requires application of a combined subjective-objective standard: (1) Subjectively, what facts did the applicant know, and (2) objectively, would a reasonable person perceive that the known facts create a potential risk? In other words, an insurance company may invoke a policy exclusion for undisclosed risks if, in completing the application, the applicant failed to disclose known information which would reasonably be perceived as a potential risk.

## FACTS AND PROCEDURAL BACKGROUND

### The Undisclosed Risk of Loss

The insurance application at issue was completed by Peoples Bank (the Bank) when it applied for an errors and omissions (E&O) endorsement to a directors and officers (D&O) liability insurance policy issued by Progressive Casualty Insurance Company (Progressive). Shortly after the policy was issued, the Bank sought coverage and a defense against allegations made by American Special Risk Management Corporation (American). American alleged that the Bank was guilty of negligence and conversion by failing to exercise ordinary care when it allowed an American employee, William Cahow, to open a business (a doing business as [d/b/a] or a sole proprietorship) account in the name of "Bill Cahow d/b/a American Special Risk Management" and when it honored improperly endorsed checks that were owned by American and pre-

sented by Cahow. See K.S.A. 84-3-420 (conversion of instruments). Over an 8-year period, Cahow repeatedly and consistently deposited American's funds in the business account and then transferred funds to his personal account, which was also at the Bank.

Cahow's scheme unraveled when one of American's clients questioned an endorsement on a check the client had issued. The inquiry roused American's suspicions, causing it to begin an investigation. Pursuing the routing of the check, American's president called the Bank and talked with Robert Chenoweth, who was serving as the Bank's senior operations officer, about whether there were any accounts in American's name at the Bank. Chenoweth checked the Bank's records and advised American of the sole proprietorship account. American's president told Chenoweth the account was not authorized by American and no corporate funds should go through the sole proprietorship account.

Chenoweth eventually put a temporary hold on two checks totaling approximately $20,000, one check made payable to "American Special Risk Management c/o Bill Cahow" and the other check made payable to "American Special Risk Management." Chenoweth testified that the funds were not yet collected on the checks; thus, he was able to put a hold on the checks as uncollected funds. He further suggested that American contact the issuers of the checks and request them to stop payment. American followed the suggestion. In addition, American's president asked Chenoweth for the name of a local attorney, and American retained the suggested law firm in pursuit of its investigation against Cahow. An attorney from the firm spoke with Chenoweth on May 2 and May 3, 2001, regarding the hold on the checks.

Chenoweth testified that on May 22, 2001, he was notified by American that criminal charges would be filed against Cahow and that Chenoweth's name would be given to the local sheriff's office as someone familiar with the transactions. According to Chenoweth, American never indicated that it believed the Bank was liable in this matter, and the Bank considered the issue to be a dispute between American and Cahow.

*Application for Insurance and the Policy*

Approximately 3 weeks after Chenoweth learned of the criminal prosecution, the Bank applied for the D&O and E&O insurance with Progressive. The E&O application asked two questions pertaining to losses, pending litigation, and claims history:

"1. Has there been any actual, threatened or pending litigation against the Applicant or any subsidiary during the past 3 years?

"2. Are there any facts, circumstances or situations involving the Applicant, any subsidiary or any past or present director, trustee, officer or employee which could reasonably be expected to give rise to a claim?"

In response to both questions, the Bank checked the boxes labeled "No." Immediately following these questions, the application stated the following exclusionary language in bold, capital letters:

**"PERTAINING TO QUESTION 1, IT IS UNDERSTOOD AND AGREED THAT ANY CLAIM ARISING FROM ANY PRIOR OR PENDING LITIGATION IS EXCLUDED FROM COVERAGE. PERTAINING TO QUESTION 2, IT IS FURTHER UNDERSTOOD AND AGREED THAT IF KNOWLEDGE OF ANY FACT, CIRCUMSTANCE OR SITUATION EXISTS, ANY CLAIM OR ACTION SUBSEQUENTLY ARISING THEREFROM SHALL BE EXCLUDED FROM COVERAGE."**

Progressive issued the Bank a D&O claims-made insurance policy with the E&O endorsement. The period for the entire D&O/E&O policy ran from July 1, 2001, through July 1, 2002. The E&O endorsement application was made part of the endorsement. Pursuant to the first page of the E&O application, "the particulars and statement contained in this Application . . . and any material submitted therewith . . . are the basis of the Policy/Bond and are to be considered as incorporated in and constituting a part of this Policy/Bond." See K.S.A. 40-2205(A) (insured not bound by any statement made in application unless copy of "application is attached to or endorsed on the policy when issued as part thereof"). The E&O endorsement incorporated much of the D&O policy language into its terms.

*The Claim and Progressive's Position*

Just a few months after the policy was issued, American sued both Cahow and the Bank for damages resulting from Cahow's

embezzlement and the Bank's negligence. American notified Progressive of the suit. Progressive acknowledged receipt of the claim and, after an investigation, gave a preliminary indication that no coverage existed under the policy. The Bank and Progressive maintained communications about the claim and coverage issue, with Progressive continuing to say that it was not denying coverage and its conclusion was preliminary, but the possibility of coverage was unlikely.

On July 18, 2002, American offered to settle the case with the Bank, and the offer was forwarded to Progressive. In its letter, the Bank stated that it continued to invite Progressive's participation in the case and formally extended "such invitation to the possible settlement negotiations." The Bank gave Progressive until August 2, 2002, to decide; otherwise, "[i]f we have heard nothing by that time, we will presume that your denial is final and we will negotiate on our own." Still, Progressive made no final decision on coverage and took no position on whether the Bank should accept the offer.

Then, on September 4, 2002, an attorney for the Bank sent a letter to Progressive, stating that the Bank would enter into a consent judgment with American within 5 days unless Progressive confirmed indemnification coverage or agreed to defend the Bank in the case. Having received no response from Progressive, the Bank entered into a settlement agreement with American and, after the district court held a hearing on the matter, judgment was entered in favor of American.

*Garnishment Action*

After obtaining the monetary judgment against the Bank, American filed a garnishment action against Progressive and others. Later, Continental Casualty Company, as bond carrier for American, intervened. The garnishment action went to trial on four issues: (1) whether, at the time of applying for insurance with Progressive, there were any facts, circumstances, or situations involving the Bank or any past or present officer or employee which could reasonably be expected to give rise to a claim; (2) whether the Bank breached the insurance policy by settling its case with American; (3) whether the settlement was reasonable; and (4)

whether American was entitled to attorney fees. The district court ruled in favor of Progressive.

With regard to the first issue (which is the only issue before us), the district court concluded the application and policy language imposed a combined subjective-objective standard: "The issue . . . must be resolved based on the subjective knowledge of the bank and from an objective determination of whether such knowledge could reasonably be expected to give rise to a claim." Applying this standard the district court concluded:

"In a situation where an employee is known to have had an account open at the bank, in the name of the employer, without authority for eight years and is known to have deposited corporate funds in the account, it is a situation that could reasonably be expected to give rise to a claim. The bank knew that one check had cleared the account and been paid by the drawer bank because Peoples Bank guaranteed that the money had been deposited into a corporate account. Two checks were stopped before that happened, but with the account open for eight years, and with the information the bank had, the Court finds that there were facts, circumstances or situations known to the bank which could reasonably be expected to give rise to a claim in the future and the claim is therefore excluded from coverage."

The court found it "almost inconceivable" that Bank personnel, with their knowledge of the banking industry and the facts known in this case, would not have checked Cahow's accounts to ascertain the Bank's maximum exposure.

Although the district court stated it was unnecessary to resolve the three other issues in light of its finding that coverage was excluded, the court addressed the merits of two of the remaining issues "to avoid having to try the case, again, should there be a reversal on appeal." Specifically, the court found that the Bank breached the insurance policy by entering into a settlement with American without first obtaining Progressive's written consent and that Progressive had no duty to defend under the terms of the D&O/E&O policy. The district court did not determine whether the settlement was reasonable and also denied American's claim for attorney fees.

*Court of Appeals Decision*

American appealed to the Court of Appeals, contending that the district court erred in finding its claim against the Bank was excluded from coverage under Progressive's E&O endorsement. American raised three arguments regarding the coverage issue: (1) It was immaterial whether the Bank could have reasonably expected a claim because, under Kansas law, the issue was whether the Bank made a knowing misrepresentation (fraud) on the E&O endorsement application; (2) even if its first argument lacked merit, the nature of question two in the endorsement application was purely subjective and the district court erred in applying an objective standard; and (3) even under an objective standard, the facts did not support the district court's decision.

The Court of Appeals panel rejected the arguments and affirmed the district court. *American Special Risk Management Corp. v. Cahow*, No. 95,942, unpublished decision filed July 6, 2007. The panel first noted the district court's decision was not based on a determination of fraud, and the appellate briefs failed to show that fraud was ever alleged before the district court. Then, the panel determined that a two-prong subjective-objective analysis was appropriate in examining the language of the E&O endorsement and adopted the following standard: "(1) We subjectively examine the facts known to [the Bank] when it completed the insurance application; and (2) the test of whether the known facts 'could reasonably be expected to give rise to a claim' entails a classic objective criterion." *American*, slip op. at 13.

Applying the initial, subjective part of the inquiry, the Court of Appeals panel examined the Bank's knowledge of the situation before it completed the application for the E&O endorsement. Next, delving into the second, objective part of the inquiry, the panel examined whether the facts supported the district court's objective determination that the Bank's knowledge at the time of the application " 'could reasonably be expected to give rise to a claim.' *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 233 (3d Cir. 2006)." *American*, slip op. at 13-14. The panel concluded that the district court properly balanced the interests in this case

and correctly found that, because the facts known by the Bank at the time of its application, the Bank should have reasonably expected a potential claim concerning Cahow's improper use of a proprietorship account. Slip op. at 19.

As a result of this ruling, the Court of Appeals found moot American's remaining contention that the district court erred in holding that the Bank had breached its obligations under the insurance policy by failing to obtain Progressive's written consent before settling with American. Slip op. at 21.

American and Continental Casualty as its bond carrier (referred to collectively as American) filed a petition seeking this court's discretionary review of the Court of Appeals decision, and review was granted.

## TWO-PRONG, SUBJECTIVE-OBJECTIVE ANALYSIS

In its petition for review, American contends that the Court of Appeals panel erred in affirming the district court's use of the two-prong, subjective-objective analysis for determining whether the Bank was entitled to coverage for American's claim. American urges this court to apply a purely subjective analysis to the examination of the Bank's prior knowledge. Further, in applying that standard, American argues that it must be shown that the Bank knowingly, and with the intent to deceive, made a false representation in the application. In other words, fraudulent misrepresentation must exist in order for Progressive to avoid its obligations under the E&O endorsement—an issue American did not present to the district court.

*Standard of Review*

As we review these arguments, a mixed standard of review applies. To the extent we are reviewing the district court's findings of fact, we examine whether the findings are supported by substantial competent evidence and are sufficient to support the district court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a finding. And our appellate review of the district court's conclusions of law is unlimited. *Owen Lumber Co. v. Chart-*

*rand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007); *LSF Franchise REO I v. Emporia Restaurants, Inc.*, 283 Kan. 13, 19, 152 P.3d 34 (2007); *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004).

The unlimited standard of review applies for another reason as well: Resolution of the issue before us requires us to interpret the provisions of an insurance contract, and such an interpretation is a question of law over which we have unlimited review. *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120 (2003). Our construction of the insurance policy is governed by well-known rules. First, a court should consider the instrument as a whole and try to ascertain the parties' intention from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished. *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 575, 56 P.3d 789 (2002). Second, if a provision is ambiguous, the insurance policy language is tested by what a reasonably prudent insured would understand the language to mean, not by what the insurer intended the language to mean. *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, Syl. ¶ 3, 46 P.3d 1120 (2002). Third, limiting or exclusionary insurance provisions are to be construed narrowly against the insurer. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 327, 961 P.2d 1213 (1998).

*Claims-Made Policy*

In considering the policy coverage, it is noteworthy that the D&O/E&O policy obtained by the Bank was a claims-made liability policy. Under a claims-made policy, coverage is only triggered when, during the policy period, an insured discovers and notifies the insurer of either claims against the insured or occurrences that might give rise to such claims. This differs significantly from an occurrence policy, in which the coverage becomes effective if the negligent or omitted acts occur *during* the term of the policy. *LaForge v. American Cas. Co. of Reading, Pa.*, 37 F.3d 580, 583 (10th Cir. 1994); see *Marshall*, 276 Kan. at 101-02; *St. Paul Fire & Marine Ins. v. House*, 315 Md. 328, 332-33, 554 A.2d 404 (1989)

(discussing differences between occurrence and claims-made policies).

In a claims-made policy, the notice is the trigger that invokes coverage. Clear notice of a claim or occurrence during the policy period is crucial because allowing actual notice beyond the policy period would " 'constitute[ ] an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy.' " *American Cas. Co. v. Continisio*, 17 F.3d 62, 68 (3d Cir. 1994) (quoting *Zuckerman v. Nat. Union Fire Ins.*, 100 N.J. 304, 310-13, 495 A.2d 395 [1985]). Claims-made policies can provide more underwriting certainty for risks like professional responsibility because the notice requirements allow an insurer to " 'close its books' on a policy at the expiration date and thus 'attain a level of predictability unattainable under standard occurrence policies.' [Citations omitted.]" *LaForge*, 37 F.3d at 583. To ensure that only risks of unknown loss are potentially incurred, claims-made policies are generally written to eliminate coverage for claims arising out of "negligent acts or omissions known to the insured prior to policy inception, notwithstanding that the claim is made during the policy period." Wade & Essoff, *Lawyers Professional Liability: A Primer on Prior Knowledge*, 30 ABA Brief 29, 35 (Fall 2000); see also *SCA Services, Inc. v. Transportation Insurance Co.*, 419 Mass. 528, 532, 646 N.E.2d 394 (1995) ("It follows from the general principle that an insured cannot insure against the consequences of an event which has already begun.").

This attempt to limit certain risks explains why Progressive questioned the Bank about whether there were any "facts, circumstances or situations" which could "reasonably be expected to give rise to a claim." It further explains why the E&O endorsement application specifically excluded any claim or action arising out of any such fact, circumstance, or situation known to exist.

Often, the exclusion for known facts, circumstances, or situations is referred to as the "known loss," "fortuity," or "loss-in-progress" doctrine. The doctrine "embod[ies] the concept that one may not obtain insurance for a loss already in progress, or for a loss that the insured either knows of, planned, intended, or is aware is substan-

tially certain to occur." 43 Am. Jur. 2d, Insurance § 479; see 3 Bjorkman, Leitner & Simpson, Law & Prac. of Ins. Coverage Litig. § 35:9 (2008) ("When a policyholder knew, or reasonably should have known, of a *substantial probability* of loss prior to the inception of an insurance policy, that policy should not cover the loss."); Jerry & Richmond, Understanding Insurance Law § 63, pp. 437-38 (4th ed. 2007). Simply put, whether enforced through policy language or through a rescission of the insurance policy, an insured cannot obtain coverage for the risk of a known loss.

Much controversy in this area dances around the extent or definition of "prior knowledge." Parties quibble over whether the insured's prior knowledge should be analyzed by a fraud standard, a subjective standard, an objective standard, or some combination thereof.

*Fraudulent Misrepresentation*

American advances the position that Progressive cannot avoid its obligation to the Bank under the E&O endorsement unless Progressive proves by clear and convincing evidence that the Bank knowingly made a false statement on the application; in other words, it argues that a fraud standard applies. In support of this argument, American cites Kansas cases involving the rescission of insurance contracts. One such case is *Scott v. National Reserve Life Ins. Co.*, 143 Kan. 678, 56 P.2d 76, *modified* 144 Kan. 224, 58 P.2d 1131 (1936).

In *Scott*, the insured falsely and knowingly denied that he had previously been turned down by other life insurance companies. Consequently, the *Scott* court found the evidence contained all the elements required to show fraud as a matter of law. 144 Kan. at 227. The court ultimately held the insurer was not liable on the life insurance policy and upheld the insurance company's rescission of the contract. 144 Kan. at 227; see also *Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, 587, 809 P.2d 533 (1991) (using the standard for fraudulent misrepresentation, finding that insured's failure to disclose information about positive HIV test not sufficient to rescind insurance contract); *Nordstrom v. Miller*, 227 Kan. 59, Syl. ¶ 10, 605 P.2d 545 (1980) ("Rescission is an equitable remedy

designed to afford relief from contracts entered into through mistake, fraud or duress.").

Under the reasoning of *Scott*, American argues that to exclude its claim against the Bank, Progressive has the burden to show that the Bank committed fraud in filling out its insurance application. This argument fails, however, because, unlike the situation in *Scott*, Progressive did not attempt to rescind the entire contract.

Rescission was an option available to Progressive because Section IX(C)(3) of the D&O policy granted the right to void the policy ab initio for misrepresentation. The provision stated in part:

"[I]n the event the **Application** contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy** shall be void ab initio in its entirety and of no effect whatsoever."

Under the clear language of this provision, Progressive would have to establish that the Bank had an intent to deceive, meaning that fraud would have to be established. See *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191 (2004) (elements of fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard of the truth, upon which another party justifiably relies and acts to his or her detriment).

Nevertheless, Progressive did not attempt to meet this standard; it did not allege that the Bank made misrepresentations with "the actual intent to deceive," and it did not seek rescission of the contract.

Instead, Progressive sought to invoke the specific disclaimer and exclusionary language in the E&O endorsement application in order to deny coverage for the claim related to Cahow. Progressive clearly asserts in its appellate brief that this case "has nothing to do with fraud. Coverage for this claim is simply excluded."

Progressive was contractually entitled to enforce the exclusion rather than seek to void the policy; in other words, nothing required Progressive to invoke Section IX(C)(3) rather than the exclusion. See *American Guarantee and Liability Ins. v. Fojanini*, 90 F. Supp. 2d 615, 619 n.7 (E.D. Pa.) (rejecting notion that fraud-

ulent misrepresentation had to be proven when complaint merely invoked policy exclusion), *recons. granted in part on other grounds* 99 F. Supp. 2d 558 (E.D. Pa. 2000).

Hence, the standard is governed solely by the language of the nondisclosure exclusion, and that exclusion does not include any of the elements of fraud. For example, even though there is a requirement that the applicant have knowledge of facts, the exclusion does not require that the failure to disclose that information be intentional or reckless. Rather, as was alleged by Progressive, the Bank's failure to disclose the risk could have resulted from negligence, and the exclusion would apply. See *Myers v. Lashley*, 44 P.3d 553, 563 n.54 (Okla. 2002) ("In civil law the element of 'prior knowledge' is not always tantamount to willfulness of conduct. Willfulness stems from 'guilty knowledge' which is synonymous with 'culpable knowledge' or 'scienter.' "); *cf.* K.S.A. 2007 Supp. 40-2,118 (defining "fraudulent insurance act"); *Ortiz v. Biscanin*, 34 Kan. App. 2d 445, Syl. ¶ 8, 122 P.3d 365 (2004) ("Pursuant to K.S.A. 40-2,118[a], in order to establish fraud on the part of the insured, an insurer must prove by clear and convincing evidence that its insured knowingly and with intent to deceive signed an application the insured knew contained materially false statements.").

We, therefore, reject the argument that Progressive must establish the Bank committed fraud in completing the application.

*Subjective Standard*

American argues that even if Progressive is not required to prove that the Bank had an "intent to deceive," the plain language on the application implicated the Bank's subjective belief about whether the known facts or circumstances could reasonably be expected to give rise to a claim. American contends that the language called for the insured to express an opinion.

Further, American argues that the Bank answered the questions on the application honestly, based on the Bank's subjective belief, and should not be punished for doing so. American suggests that the district court's decision has set the "prior knowledge" bar so low that applicants will be deemed to have knowledge of virtually

all potential claims relating to prepolicy coverage, such that no coverage will exist for those claims—effectively turning a claims-made policy into an occurrence policy. And, in American's view, the fact that hindsight revealed a claim would ultimately be made does not mean the Bank believed that a claim could reasonably be expected when it completed the policy application.

Progressive counters that Kansas public policy should not require persons or entities to have an actual awareness that a claim will be made before the exclusion applies. This would, in effect, set the bar too high.

American's position that a purely subjective standard applies has some support, although it has been endorsed by only a minority of courts. One case frequently cited for its rationale in the application of the subjective standard is *Estate of Logan v. Northwestern Nat.*, 144 Wis. 2d 318, 424 N.W.2d 179 (1988). *Logan* involved a professional liability policy that provided coverage for claims first made during the policy period by reason of any act, error, or omission in professional services rendered: " 'PROVIDED ALWAYS THAT such act, error or omission . . . happens: (aa) during the policy period, or (bb) prior to the policy period, provided that prior to the effective date of this policy: . . . 2. *the Insured had no basis to believe* that the Insured had breached a professional duty.' " 144 Wis. 2d at 337. The Wisconsin Supreme Court held that under the clear language of the policy, a subjective standard applied. 144 Wis. 2d at 337-38.

*Logan* presents a different question from that in this case, however, because the policy language in *Logan* is distinguishable. The *Logan* policy focused on the insured's beliefs and whether the insured had developed a belief that a claim might ensue. Additionally, the *Logan* provision did not include a phrase such as "reasonably believe" or "reasonably foreseeable." Such a phrase shifts the focus from the individual's belief to the phantom reasonable person and raises the objective standard.

Similarly, the policy language at issue in this case is distinguishable from the policy construed in another case on which American relies, *Citizens Bank of Jonesboro v. Western Emp. Ins.*, 865 F.2d 964 (8th Cir. 1989). In *Citizens Bank*, the applicant had responded,

"No," to a question on the policy application asking if he was "aware of any fact, circumstance or situation which he has reason to believe might result in any future claim which would fall within the scope of the proposed insurance[.]" 865 F.2d at 965. The Eighth Circuit Court of Appeals noted that the question contained "a judgmental component and implicitly acknowledge[d] the lack of absolute certainty in the answer." 865 F.2d at 966. Further, "when a question calls for an answer based on interpretation of known facts and circumstances, as distinguished from a simple disclosure of historical facts, the response is measured under Arkansas law by whether the individual answering the question was justified in the *belief* expressed. [Citations omitted.]" (Emphasis added.) 865 F.2d at 966.

Both the district court and the Eighth Circuit Court of Appeals focused upon the fact the provision required a statement of personal belief, a statement which would be inherently subjective. Again, there was no language raising the specter of an objective, reasonable person, *i.e.*, the classic objective standard.

Other cases utilize the subjective standard, but in each of those cases the policy language is distinguishable or the court fails to explain why the classic objective language is ignored. See, *e.g.*, *Enserch Corp. v. Shand Morahan & Co., Inc.*, 952 F.2d 1485, 1496-97 (5th Cir. 1992) ("Texas law holds that even a material misrepresentation in an insurance application does not defeat recovery if it is made innocently and in good faith. A good faith standard implies subjectivity; an objective standard could not fit within a test that allowed innocent misrepresentations."); *General Acc. Ins. Co. of America v. Trefts*, 657 F. Supp. 164, 167-68 (E.D. Mo. 1987) (construing Missouri law); *Fojanini*, 90 F. Supp. 2d at 620 (under Pennsylvania law policy set forth purely subjective standard of proof requiring evidence of company official's actual knowledge that claim or lawsuit could arise); *Liebling v. Garden State Indem.*, 337 N.J. Super. 447, 462-63, 767 A.2d 515 (2001) (finding the "reasonably could have foreseen" exclusion to mean the insured's subjective knowledge or belief).

*Objective Standard*

In contrast to the relatively small number of courts that have adopted the subjective standard, most of the courts considering the issue have adopted the objective approach. See, *e.g.*, *Coregis Ins. Co. v. Camico Mut. Ins. Co.*, 959 F. Supp. 1213, 1222 (C.D. Cal. 1997) (endorsing reasonable person standard); *Maynard v. Westport Ins. Corp.*, 208 F. Supp. 2d 568, 576 (D. Md. 2002) (looking to what " 'objectively reasonable attorney knew or should have known' "), *aff'd* 55 Fed. Appx. 667 (4th Cir. 2003) (unpublished opinion); *Nat'l Union Ins. Co. v. Holmes & Graven*, 23 F. Supp. 2d 1057, 1066 n.7 (D. Minn. 1998) (holding "an objective, and not a subjective, standard applies"); *Home Indem. Co. Manchester, N.H. v. Toombs*, 910 F. Supp. 1569, 1574 (N.D. Ga. 1995) (subjective question was irrelevant because "as a matter of law, . . . [the insured] made an objectively false statement"); *Evanston Ins. Co. v. Security Assur. Co.*, 715 F. Supp. 1405, 1414 (N.D. Ill. 1989) (" 'reason to suppose' " language "calls for no judgmental or subjective evaluation, but in traditional objective language requires the disclosure of any facts indicating the probability of a covered claim"); *Smith v. Neumann*, 289 Ill. App. 3d 1056, 682 N.E.2d 1245 (1997) (objective standard applied to alleged drafting error); *Wittner, Poger, Etc. v. Bar Plan Mut.*, 969 S.W.2d 749, 754 (Mo. 1998) (entry of default against client together with client's letters of complaint "was sufficient to establish a 'basis to believe that the insured committed such act or omission' " regardless of the subjective belief of the lawyers involved).

Generally, these decisions focus upon the fact the "prior knowledge" clause includes the phrase "reasonably foreseeable," "reasonably believe," or similar language. See Wade & Essoff, 30 ABA Brief 29; Neumeier, *Disclaiming Coverage When the Insured Fails to Give Proper Notice of "Any Circumstance" Giving Rise to a Claim*, 41 Tort Trial & Ins. Prac. L.J. 45, 48-51 (2005). But some courts have applied the objective standard even without any reasonably foreseeable language in the insurance policy. See, *e.g.*, *International Ins. Co. v. Peabody Intern. Corp.*, 747 F. Supp. 477, 482 (N.D. Ill. 1990) (question on insurance application asking

whether insured was " 'aware of any circumstances, occurrence or condition . . . which may result in the . . . assertion of a claim' " was deemed to be objective, not subjective); *Ratcliffe v. Int'l Surplus Lines Ins. Co.*, 194 Ill. App. 3d 18, 26, 550 N.E.2d 1052 (1990) (applying objective standard to D&O insurance policy; finding prior knowledge clause required disclosure of any facts which, "objectively considered, might have given rise to a claim, regardless of the applicant's subjective belief").

It has been suggested that the theoretical basis for the objective standard stems directly from insurers' primary purpose of avoiding acceptance of known risks—or at least adjusting policy language or premiums to reflect such risks. Wade & Essoff, 30 ABA Brief at 38. In contrast, a subjective standard by itself could " 'defeat the ability of an insurance company to assess risk prior to issuing insurance' " because the insured would be permitted to determine "unilaterally whether the risk is material and accordingly, whether it should be reported." Wade & Essoff, 30 ABA Brief at 38 (quoting *Mt. Airy Ins. Co. v. Thomas*, 954 F. Supp. 1073, 1079 [W.D. Pa. 1997]).

*Two-Prong, Subjective-Objective Standard*

Despite the widespread use of the objective standard, more recently some courts have chosen to apply exclusionary provisions according to an "intermediate" standard utilizing a two-prong, subjective-objective test. This modern two-prong analysis was applied by the district court and then adopted by the Court of Appeals in our case. Under this inquiry, the court first asks the subjective question of whether the insured knew of certain facts and then asks the objective question of whether such facts could reasonably have been expected to give rise to a claim. The reasoning behind the application of this standard is based upon the plain language of the insurance policy—the use of both subjective and objective elements in the critical language of the policy is deemed to clearly express the parties' intent to incorporate both components.

The Court of Appeals cited one such case, *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231 (3d Cir. 2006), where the insured real estate brokerage firm (Colliers) sued its profes-

sional liability insurer for breach of contract after the insurer denied coverage for a claim arising from a mistake the firm had committed before obtaining its claims-made insurance policy. The insurance coverage to Colliers provided that " 'the insured had no knowledge of any suit, or any act or error or omission, which might reasonably be expected to result in a claim or suit as of the date of signing the application for this insurance.' " 458 F.3d at 234.

The *Colliers* court, construing New Jersey law, predicted that the New Jersey Supreme Court would hold that a clear and unambiguous insurance policy exclusion should be applied according to the "plain language of the exclusion unless it violates public policy as well as the objectively reasonable expectations of the insured." 458 F.3d at 237. The *Colliers* court held that the exclusionary provision was clear and unambiguous and that the plain language mandated a two-prong, subjective-objective test:

"The first condition in the exclusion is satisfied if *the insured had knowledge* of the relevant suit, act, error, or omission. Accordingly, we conclude that this part of the exclusion depends on the insured's actual knowledge, or subjective awareness of the relevant suit, act, error, or omission. The second condition in the exclusion, in contrast, is satisfied if the suit, act, error, or omission *might reasonably be expected* to result in a claim or suit. This language does not require that the insured actually form such an expectation, and we conclude that this part of the exclusion gives rise to an objective test: whether a reasonable professional in the insured's position might expect a claim or suit to result." 458 F.3d at 237.

The *Colliers* court further held that applying the exclusion according to the combination subjective-objective standard arising under the plain language of the exclusionary provision would not violate New Jersey's public policy. 458 F.3d at 240-41. By including in the policy exclusion an objective test for the second part of the inquiry, an insurer attempts to reasonably limit a hazard where a professional or entity is subjectively aware of an error, seeks new or additional liability insurance, and later tries to disingenuously convince a court the insured was subjectively unaware of the legal implications of the error. 458 F.3d at 240-41.

Likewise, in another case decided by the Third Circuit Court of Appeals, the court found the policy language determinative and applied a subjective-objective standard. In *Selko v. Home Ins. Co.*,

139 F.3d 146, 149 (3d Cir. 1998), an attorney malpractice policy stated that an act, error, or omission that had occurred prior to the policy period would be covered provided that "prior to the effective date of this policy . . . the insured had no basis to believe that the insured had breached a professional duty." The insurance application asked whether the insured "know[s] of any circumstances, acts, errors or omissions that could result in a professional liability claim against any attorney of the firm, or its predecessor." 139 F.3d at 149. The *Selko* court held that the plain language of the policy required a two-prong analysis:

"First, it must be shown that the insured knew of certain facts. Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a 'basis to believe,' it must be determined that a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty." 139 F.3d at 152.

The *Selko* court reasoned that such a construction neither relieves the insurer of its burden to prove that the necessary underlying facts were actually known to the insured, nor may the insured successfully defend on the ground that he or she was uniquely unaware of ethical and fiduciary principles that all lawyers would know or that the insured did not understand the implications of conduct and events that any reasonable lawyer would have grasped. 139 F.3d at 152; see also *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 306 (3d Cir. 2001) (applying *Selko* test to exclusion in insurance policy); *Westport Ins. Corp. v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444, 456 (M.D. Pa. 2007) (stating that although no Pennsylvania court has directly addressed application of prior knowledge exclusion, the Third Circuit Court of Appeals has predicted the Pennsylvania Supreme Court would apply subjective-objective standard); *Westport Ins. Corp. v. Lilley*, 292 F. Supp. 2d 165, 171 (D. Me. 2003) ("[T]he Court must decide whether a reasonable attorney in possession of such knowledge would reasonably foresee that a malpractice claim might be forthcoming. This test incorporates both subjective and objective elements."); *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka*, 267 F. Supp. 2d 601, 608 (E.D. Tex. 2003) (applying two-prong approach under clear policy language asking: "What would any rea-

sonable attorney expect, given the facts of which the insured was actually aware?"); *TIG Insurance Company v. Blacker*, 54 Mass. App. 683, 688, 767 N.E.2d 598 (2002) (the phrase " 'reasonable basis to foresee' " in professional liability insurance policy application asking attorney whether there was reasonable basis to foresee a claim contained both subjective and objective elements and referred to insured attorney's basis to foresee a claim and to what reasonable attorney would foresee given the insured's knowledge); *O'Connell & Assocs. v. Transamerica*, 61 Wash. App. 103, 109-10, 809 P.2d 231 (1991) (applying objective-subjective analysis; policy combined actual knowledge requirement with reasonably foreseen requirement).

The cases applying the subjective-objective standard focus upon the plain language of a policy's disclaimer or exclusionary language. This focus is well illustrated by the decisions of the Virginia courts, which assess an insured's prior knowledge under either the objective *or* subjective standard depending on the terms of the policy. The objective standard was applied when the insurance application for professional liability insurance inquired whether any attorney in the firm was aware of an act or omission that "may reasonably be expected to be the basis of a claim against them." *Continental Cas. Co. v. Graham & Schewe*, 339 F. Supp. 2d 723, 727 (E.D. Va. 2004). Under that policy language, the appropriate inquiry is "whether a reasonable person in possession of the facts known to the insured . . . would have had a reasonable basis to know that a claim might be made. [Citation omitted.]" 339 F. Supp. 2d at 727.

On the other hand, the subjective standard has been applied by courts applying Virginia law where the application asked the prospective insured to affirm that he or she has completed the application "to the best of [his or her] knowledge." In *Parkerson v. Federal Home Life Ins. Co.*, 797 F. Supp. 1308, 1315 (E.D. Va. 1992), the court explained that while an insurer generally is not required to establish that an untrue representation was willfully false or fraudulently made, "where . . . the insurer asks the insured to aver only that the representations are true to the best of the insured's knowledge and belief, the insurer must clearly prove

that the insured's answers were knowingly false. [Citations omitted.]" See also *Sterling Ins. Co. v. Dansey*, 195 Va. 933, 941-42, 81 S.E.2d 446 (1954) (finding that where answers in application for insurance are stated to be true to best knowledge and belief of applicant, an incorrect statement innocently made in belief of its truth will not avoid the policy).

*Kansas Cases*

Such fidelity to the contract language is consistent with Kansas cases and the general rules regarding insurance contract construction. See *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 103, 73 P.3d 120 (2003) ("In any review of insurance coverages, we must always be guided by the language of the insurance contract.").

In addition, Kansas cases have recognized the policy language can create both objective and subjective standards. For example, in *Home Life Ins. Co. v. Clay*, 13 Kan. App. 2d 435, 773 P.2d 666, *rev. denied* 245 Kan. 783 (1989), the court applied both standards. In *Home Life*, an insurance company sued its former employee, Clay, for forging checks belonging to the company and depositing them in his own bank account. Home Life also sued the employee's Bank for conversion. The Bank filed a third-party claim against Reliance Insurance Company, one of its bonding companies. The question in *Home Life* involved at what point the Bank discovered its loss, where the bond provided:

" 'This bond applies to loss discovered by the Insured during the bond period. Discovery occurs when the *Insured becomes aware* of facts which would cause a *reasonable person* to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.

" 'Notice to the Insured of an actual or potential claim by a third party which alleges that the Insured is liable under circumstances which, if true, would create a loss under this bond constitutes such discovery.' " (Emphasis added.) 13 Kan. App. 2d at 448.

Before the Bank completed its application of bond coverage, Home Life had informed the Bank of the loss by Clay but stated that it would not file a lawsuit against the Bank. The Bank did not disclose the existence of the claim or its conversation with Home Life on its application. The Court of Appeals provided a discussion of the words "potential claim" before finding the Bank was not

required to disclose the facts surrounding Clay's forgeries. 13 Kan. App. 2d at 450.

In referencing standards to apply, the Court of Appeals quoted an objective standard from *Jefferson Bank & Trust Co. v. Central Sur. & Ins. Corp.*, 408 S.W.2d 825, 832 (Mo. 1966) (" '[T]he time of discovery of the risk insured against is when the bank must reasonably have known and recognized that Brede had suffered a loss and that Brede apparently intended to attempt to hold the bank liable for such a loss.' "), and also a subjective standard from *United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 365 (8th Cir. 1971) (" 'In determining when discovery has taken place, the trier of fact must find the pertinent underlying facts known to the insured and must further determine subjective conclusions reasonably drawn therefrom by the insured.' "). *Home Life*, 13 Kan. App. 2d at 450-51.

*Standard in this Case*

In light of these various approaches, which should apply in this case?

This dispute must be resolved by the language used in the E&O endorsement. See *Marshall*, 276 Kan. at 103. Again, the E&O endorsement application asked the applicant two questions:

"1. Has there been any actual, threatened or pending litigation against the Applicant or any subsidiary during the past 3 years? If 'Yes' provide details by attachment.

"2. Are there any facts, circumstances or situations involving the Applicant, any subsidiary or any past or present director, trustee, officer or employee which could reasonably be expected to give rise to a claim? If 'Yes' provide details by attachment."

Following those questions, the application specified that "if knowledge of any fact, circumstance or situation exists, any claim or action subsequently arising therefrom shall be excluded from coverage."

Question one clearly asked for history, *i.e.*, what has happened in the past 3 years. Question two, however, with the corresponding exclusionary language combined an actual knowledge requirement and a reasonably expected requirement. Given the actual knowl-

edge requirement, we need not consider whether to impute knowledge of information the Bank should reasonably have known. Rather, we must examine the Bank's prior knowledge, a requirement that invokes a subjective standard, requiring a subjective determination of the applicant's knowledge. In contrast, the reasonably expected language requires an objective evaluation of the facts. This dichotomy of terminology in the insurance application mandates utilizing the two-prong approach. See *O'Connell & Assocs.*, 61 Wash. App. at 110 ("In interpreting the policy language, the court must look at the acts, errors, and occurrences known to the insured and determine whether the insured would reasonably expect them to result in a claim.").

Such a reading of the policy is consistent with the goal of allocating risks. Neither the insurer nor the insured knows ahead of time what claims will give rise to liability. In order to properly allocate the risk, liability insurance policies of this nature place the burden on the insured to disclose those known facts or circumstances that could reasonably be expected to give rise to a claim, so that the costs of those risks can be evaluated with all the relevant information accessible to all parties. See *Selko*, 139 F.3d. at 151; see also *Marshall*, 276 Kan. at 110 ("Preventing insurance fraud positively affects the citizens of Kansas by making excess liability insurance available at a reasonable cost.").

Therefore, the district court and the Court of Appeals did not err in applying a two-prong, subjective-objective approach to determining whether Progressive is liable under the E&O endorsement.

## APPLICATION OF STANDARD

The next question follows: Does substantial competent evidence support the district court's finding that coverage was excluded under the E&O endorsement? The answer is "yes."

*Subjective Prong*

First, we apply a subjective test for the initial part of the inquiry—what was the Bank's knowledge of the "facts, circum-

stances, or situation" before it completed the application on June 12, 2001?

The evidence establishes that at the time the Bank submitted the E&O endorsement application to Progressive, it knew many facts regarding Cahow's financial dealings with American. The Bank knew that Cahow worked for American and had opened two accounts with the Bank—a personal account and a business or sole proprietorship account. Further, the Bank knew Cahow's sole proprietorship account had been open for 8 years, since 1993. Through telephone conversations, the Bank knew American was accusing Cahow of embezzling or diverting company funds, and Chenoweth was informed that Cahow had no authority to open an American account at the Bank.

There was some dispute regarding the Bank's knowledge of corporate checks—*i.e.*, checks made payable to American Special Risk Management Corporation—being deposited into the American Special Risk Management sole proprietorship account. The check with the questionable endorsement that triggered American's investigation was made payable to the corporation, but it is unclear whether this was made known to the Bank; some evidence affirmatively supported the view that American's president and Chenoweth did not talk about the check that caused the original concern. Instead, they talked about the two outstanding checks Chenoweth had discovered when confirming the existence of the bank accounts. The two outstanding checks were not made payable to American Special Risk Management Corporation.

On the other hand, there was evidence that the Bank knew corporate checks had been deposited. Ruth Stevenson, the Chief Operations Officer and Executive Vice President of the Bank, testified that she remembered there was a dispute about whether one check should have been deposited. In her deposition, she had indicated that the Bank got a telephone call regarding that check. At trial, Stevenson indicated she could not recall why Chenoweth placed a hold on Cahow's two accounts, except to protect the Bank. Stevenson also recognized that if a bank permits corporate checks, *i.e.*, those made payable to a "Corporation," "Inc.," "Corp.," etc., to be

deposited into a sole proprietorship account, there is a possibility that claims could be filed against the bank.

The Bank knew that American had asked it to put on hold the two outstanding checks that had been deposited in the sole proprietorship account. The Bank also knew that on the same day the two checks were deposited, Cahow wrote a check from the same sole proprietorship account for an amount nearly equal to the amount of the two checks. American contacted the issuers of the two checks to stop payment, and the Bank knew American was successful in this regard.

Moreover, on May 22, 2001, the Bank knew there was going to be a criminal investigation against Cahow and that American would refer police to Chenoweth as the contact person. Chenoweth gave American the name of local counsel to investigate pursing charges against Cahow. Finally, Chenoweth required American to send the Bank confirmation of its corporate status. American did so by letter on May 1, 2001. Recognizing American's position, Chenoweth, although stating he considered the dispute to be between American and Cahow, conceded there was reason to be concerned that Cahow had embezzled funds and filtered those funds through the Bank.

### Objective Prong

Considering the facts and circumstances known by the Bank, we next apply the objective prong and ask: Do the facts cited above support the district court's determination that the Bank's knowledge at the time of the application "could reasonably be expected to give rise to a claim?" Under this standard, it is not necessary that the Bank have actually formed an expectation that a claim would be filed. Instead, as the district court considered, the appropriate inquiry is whether a reasonable person in the position of the Bank might expect a claim to result.

The district court found it "inconceivable" that the Bank's officers, with their knowledge of the banking industry and the facts known in this case, would not have been sufficiently concerned that they would not have checked Cahow's accounts to ascertain the Bank's maximum exposure. In the view of the district court, a

reasonable person in the position of the Bank would have been concerned and conducted such an investigation.

The district court's assessment is supported by substantial competent evidence, and our review of the district court's factual findings leads us to conclude that the facts, circumstances, and situations known to the Bank at the time it completed the application could reasonably be expected to give rise to a claim.

Because the Bank had knowledge of facts, circumstances, and situations that could reasonably be expected to give rise to a claim, the failure to disclose the facts, circumstances, or situations triggers the policy exclusion that provides: "[I]f knowledge of any fact, circumstance or situation exists, any claim or action subsequently arising therefrom shall be excluded from coverage." As a result, the district court and Court of Appeals panel concluded correctly that there was no coverage under the Progressive policy.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.